No. 26-50111

# In the United States Court of Appeals for the Fifth Circuit

American Sustainable Business Council,
*Plaintiff-Appellee*,

*v.*

Glenn Hegar, in his official capacity as Texas Comptroller of Public Accounts; Ken Paxton, in his official capacity as Attorney General of Texas,
*Defendants–Appellants*.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## APPELLANTS' OPPOSED MOTION FOR STAY PENDING APPEAL

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

Cameron Fraser
Assistant Solicitor General

Counsel for Defendants–Appellants

# Certificate of Interested Persons

No. 26-50111

American Sustainable Business Council,
*Plaintiff-Appellee*,

*v.*

Glenn Hegar,[1] in his official capacity as Texas Comptroller of Public Accounts; Ken Paxton, in his official capacity as Attorney General of Texas,
*Defendants–Appellants*.

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ William R. Peterson
William R. Peterson
*Counsel of Record for*
*Defendants–Appellants*

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kelly Hancock, in his capacity as Acting Comptroller of Public Accounts of the State of Texas, should be substituted as a party for former Comptroller Glenn Hegar.

# Introduction

Texas Senate Bill 13 (SB13) governs how the State invests its own money through pensions and school funds and from whom the State purchases goods and services. In selecting the parties with whom it will invest its money and transact, the State is acting as a participant in the marketplace, not as a regulator or a sovereign. The order enjoining SB13 disregards this crucial aspect of the statute, instead analyzing SB13 as if it regulates transactions between private parties.

SB13 has two relevant provisions. The *Divestment Provision* directs six state retirement and investment funds to divest from the publicly traded securities of financial companies that boycott fossil-fuel-based energy companies. It creates an exception where doing so would be inconsistent with the funds' fiduciary duties. The *Procurement Provision* requires companies seeking state contracts for more than $100,000 to verify that they do not and will not boycott energy companies during the contract term. The statute does not regulate private speech, impose fines, or create criminal liability; no person or company faces liability of any kind for boycotting fossil fuels. The sole consequence of SB13 is the potential loss of state-investment capital and large state-procurement contracts.

The fundamental error in granting partial summary judgment was treating SB13 as if it regulated transactions between private parties rather than the State's authority over its own finances. When a State acts as a market participant—investing its own assets and purchasing goods and services for its own use—different constraints apply. The government generally "can choose its contracting partners as if it were a private party." *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 624 (5th Cir. 2010).

The Supreme Court has recognized this principle in the labor-preemption context, dormant Commerce Clause context, and First Amendment context. And earlier this month the Fourth Circuit applied this very framework to vacate a preliminary injunction of federal spending criteria, holding that facial constitutional challenges are disfavored "in the funding context" where "the government has wide latitude to set spending priorities." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*NADOHE*), 167 F.4th 86, 103 (4th Cir. 2026) (citation modified).

The partial summary judgment order enjoining SB13 did not address this aspect of the statute, instead applying the overbreadth doctrine as if SB13 regulated transactions between private parties. It demanded a degree of statutory precision that the Due Process Clause does not require when the government is allocating its own funds rather than punishing private conduct. And it entered a universal injunction that "falls outside the bounds of a federal court's equitable authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025).

The practical effect of the injunction is to compel Texas to continue investing its capital in companies that are actively campaigning against the State's own economic interests (and to award those same companies large state-procurement contracts) whether Texas wants to or not. And because SB13 has been in effect since 2021, the injunction does not preserve the status quo—it upends it, forcing the State to unwind five years of investment directives and procurement guidance that over 200 state agencies and 1,826 cooperative purchasing members have already integrated.

This Court should stay the injunction pending appeal.

## Background

In 2021, the Texas Legislature enacted SB13 with overwhelming bipartisan support. The law addresses two categories of state financial activity: (1) the management of publicly traded securities held by Texas's pension and school funds (the "Divestment Provision," Tex. Gov't Code §§ 809.001–.102); and (2) the State's purchase of goods and services through large procurement contracts (the "Procurement Provision," *id.* §§ 2276.001–.002).[2]

*The Divestment Provision*. Chapter 809 tells six state governmental entities—the Employees Retirement System, the Teacher Retirement System, the Texas Municipal Retirement System, the Texas County and District Retirement System, the Texas Emergency Services Retirement System, and the permanent school fund, § 809.001(7)[3]—how to manage their portfolios of publicly traded securities. The Comptroller compiles a list of "financial companies that boycott energy companies" based on publicly available information and, if he chooses, written verification requests to the companies. § 809.051(a). Each state fund must then identify its holdings in listed companies, notify those companies, and, if the companies do not stop boycotting within 90 days, "sell, redeem, divest, or withdraw all publicly traded securities of the financial company" on a phased schedule. §§ 809.052–.054.

[2] In 2023 Chapter 2274 was redesignated as Chapter 2276, and Sections 2274.001 and 2274.002 were redesignated as Sections 2276.001 and 2276.002.

[3] Unless indicated otherwise, all statutory citations are to the Texas Government Code.

The statute defines "boycott energy company" as, "without an ordinary business purpose, refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with a company" because it engages in fossil-fuel-based energy or does business with such a company. § 809.001(1).

SB13 has multiple fiduciary safeguards. A state fund "is not subject to" its requirements if the fund "determines that the requirement would be inconsistent with its fiduciary responsibility." § 809.005. The divestment schedule may be delayed or halted entirely if "clear and convincing evidence" shows that divestment would cause a loss in the value of its assets or a deviation from the fund's benchmark. § 809.056(a)–(b).

*The Procurement Provision*. Chapter 2276 applies to a narrow category of contracts: those between a governmental entity and a company with 10 or more full-time employees, with a value of $100,000 or more, paid wholly or partly from public funds. § 2276.002(a). The statute requires covered contracts to "contain[] a written verification" that the company does not boycott energy companies and will not do so during the term of the contract. § 2276.002(b).

Plaintiff American Sustainable Business Council (ASBC) is a membership organization whose members advocate for "sustainable" business practices. Dkt. 39-1, ¶¶ 2, 4–5. ASBC's claims concern two of its members, Etho Capital LLC and Our Sphere, Inc., both of which were placed on the Comptroller's list of financial companies that boycott energy companies. *Id.* ¶ 8.

Both companies refuse to invest in fossil-fuel companies. Etho's CEO attested that "the Etho Index screens out fossil fuel companies" and that Etho "avoids investing in companies that explore and produce fossilfuel-based energy." Dkt. 39-2, ¶¶ 10, 27. Sphere's CEO similarly attested that its fund "does not invest in fossil fuel companies." Dkt. 39-3, ¶ 6. Both companies also engage in advocacy against fossil fuels: Etho joined a 2019 Global Climate Strike, and Sphere participated in a "Virtual March to Retire Big Oil" in 2024. Dkt. 39-2, ¶ 23; 39-3, ¶ 14.

ASBC filed this action in the Western District of Texas challenging SB13 on multiple constitutional grounds. Its operative complaint asserts, as relevant here, three claims: (1) the Divestment Provision violates the First Amendment; (2) the Procurement Provision violates the First Amendment; and (3) the Divestment Provision is unconstitutionally vague. Dkt. 28 at 37–40.

ASBC moved for partial summary judgment on those three counts. Dkt. 39. Defendants opposed. Dkt. 42. The district court granted ASBC's motion on February 3, 2026. Dkt. 50.

The district court held SB13 facially overbroad under the First Amendment, reasoning that the phrase "taking any action that is intended to penalize" fossil-fuel companies "includes, for example, speaking about the risks posed by fossil fuels, advocating against reliance on fossil fuels, and associating with like-minded organizations." Dkt. 50 at 8. The court also declared the statute unconstitutionally vague, finding that the term "penalize" could "easily apply to political speech" and that the Comptroller had "provided no explanation" for listing decisions despite companies' assertions of ordinary business purposes. *Id.* at 10–11.

The summary judgment ruling did not address the fact that SB13 concerns the State acting as a market participant, an issue that the State briefed and fully preserved. *See, e.g.*, Dkt. 42 at 17 ("The Divestment provision does not implicate the First Amendment, as the State is simply acting as a market participant in buying and selling financial securities."). It did not acknowledge that SB13 governs the State's own investment and purchasing decisions rather than regulating private conduct. And it did not recognize that a different vagueness standard governs government-spending criteria. Instead, in granting summary judgment, the district court erroneously treated SB13 as though it were a generally applicable regulation governing private transactions.

The district court declared SB13 unconstitutional and entered a permanent universal injunction barring Defendants from implementing or enforcing the statute against anyone. Dkt. 50 at 11–12.

Defendants filed a notice of appeal on February 6, 2026, Dkt. 51, and moved in the district court for a stay pending appeal on February 27, Dkt. 55.

The district court denied the State's request on April 14, 2026. Dkt. 59. The State now respectfully requests a stay pending appeal from this Court.

# Argument

In determining whether to exercise its inherent power to stay an order pending appeal, this Court considers the State's likelihood of success on the merits, whether it will suffer irreparable harm without a stay, whether plaintiffs will be substantially harmed by a stay, and the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I. The State Is Likely to Succeed on the Merits.

Texas is likely to succeed on the merits of its appeal because SB13 governs how the State invests and spends its own money as a market participant, not how private parties speak. In granting summary judgment, the district court did not address this key argument and applied First Amendment and vagueness doctrines that are inapplicable to the State as a market participant. And even if SB13 were constitutionally problematic, the district court exceeded its equitable authority by entering a universal permanent injunction. *CASA*, 606 U.S. at 847.

### A. The order enjoining SB13 did not address the fact that SB13 involves the State as market participant, not the State as regulator.

#### 1. As a market participant, the State does not violate the First Amendment when it decides how to invest and spend its own money.

The district court erred by not distinguishing between the State as a regulator and the State as a market participant. The First Amendment "leaves room for the government's interests when it acts as an employer or marketplace consumer, rather than as a sovereign." *Oakes Farms Food & Distrib. Servs., LLC v. Adkins*, 154 F.4th 1338, 1343 (11th Cir. 2025). *Machinists* preemption, for example, applies only to a State as regulator, not when the State acts as a "proprietor" that "owns and manages property." *Bldg. & Constr. Trades Council v. Associated Builders & Contractors of*

*Mass./R.I., Inc.* (*Boston Harbor*), 507 U.S. 218, 225 (1993) (citation omitted). Similarly, when a State "is purchasing or selling a product or service," the Commerce Clause permits it to "choose its contracting partners as if it were a private party." *United Healthcare*, 602 F.3d at 624. It may even "deal preferentially with in-state entities." *Id.* (citing *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809–10 (1976)); *see also White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 210–14 (1983) (market-participant doctrine permitted city to require that city-funded projects employ city residents); *Reeves, Inc. v. Stake*, 447 U.S. 429, 436–37 (1980) (state-owned company could favor in-state purchasers).

The Supreme Court has recognized this in the First Amendment context as well. When "the Government is acting as patron rather than as sovereign," First Amendment constraints are relaxed. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

Constitutional provisions that constrain the State's power to regulate do not apply the same way when the State is purchasing goods or services in the marketplace. Just as the Commerce Clause does not compel a State to open its purchasing power to out-of-state competitors on equal terms, the First Amendment does not compel a State to invest its pension assets with—or award large procurement contracts to—companies that are actively working to undermine the State's own economic interests. Texas's decision to divest from financial companies that boycott fossil fuels and to require no-boycott verifications from large vendors represents the State choosing how to allocate its own capital and contracts in light of its own legitimate economic interests.

**2. SB13 involves the State as an investor.**

**1.** Chapter 809 involves the State as an investor. Chapter 809 governs which publicly traded securities six state governmental entities will hold in their own portfolios. These requirements apply only to state entities and involve only their own holdings. They do not require any private firm to stop boycotting fossil-fuel companies or to change its advocacy; they simply dictate whether Texas's pension and school-fund assets will include that firm's securities. A private pension fund could adopt precisely the same policy. The First Amendment does not forbid a State, acting in the same proprietary role with its own money, from making the same portfolio choice. *See Boston Harbor*, 507 U.S. at 229–32; *Finley*, 524 U.S. at 587–88.

The statute's fiduciary overrides confirm that this is portfolio management, not viewpoint discrimination. The statute yields to fiduciary duty whenever divestment would harm beneficiaries. §§ 809.005, .056. And Texas has a uniquely strong proprietary interest in managing its portfolio to avoid investing in firms working against its own industry. *See Boston Harbor*, 507 U.S. at 231–32.

**2.** Chapter 2276 similarly involves the State as a purchaser. For the narrow class of large contracts described above, SB13 requires only a written verification that the company does not and will not boycott energy companies during the contract term. §§ 2276.002(b)(1)–(2). The temporal limitation is critical: Texas is defining the terms of its own purchases, not demanding a permanent ideological pledge. A company may take or resume boycott actions at any time; it simply must forgo covered contracts while it does. As with Chapter 809, nothing in Chapter 2276 prevents companies from criticizing fossil fuels or advocating for divestment.

### 3. The district court erred by ignoring this framework and misapplying the overbreadth doctrine.

Rather than analyze SB13 under the deferential standards that apply when a State manages its own investments and makes its own purchasing decisions, the district court treated the statute as if it were a direct ban on private speech about fossil fuels. The district court cited *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and *Hill v. City of Houston*, 764 F.2d 1156 (5th Cir. 1985), for the proposition that the statute's "any action" language sweeps in advocacy protected by the First Amendment. Dkt. 50 at 7–9. But those cases involved generally applicable regulations that imposed liability on private actors for their speech or association—not the State's internal decisions about which securities to hold and which vendors to hire.

The district court compounded its error by invoking the overbreadth doctrine. Overbreadth is "strong medicine" that permits facial invalidation only when a statute "punishes a 'substantial' amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–20 (2003) (citation modified); *see also Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (facial overbreadth requires showing that a substantial number of a law's applications are unconstitutional). It exists to prevent speakers from self-censoring rather than risk criminal or civil sanctions under an overbroad regulatory statute. *Hicks*, 539 U.S. at 118–20. Here, however, no private party faces fines, prosecution, or civil liability for boycotting fossil fuels. Under Chapter 809, the sole consequence of being "listed" is that state funds must consider selling the firm's publicly traded securities from their portfolios, subject to fiduciary overrides. In that context, concerns about

third-party chill are dramatically diminished, and facial overbreadth challenges are disfavored. *See Finley*, 524 U.S. at 580, 587–88.

The Fourth Circuit's recent decision in *NADOHE*, 167 F.4th 86, confirms that facial First Amendment challenges are especially disfavored in the government-spending context. The Fourth Circuit vacated a preliminary injunction of an executive order that required every federal contractor and grant recipient to certify that it did not operate DEI programs violating federal antidiscrimination laws. *Id.* at 101–04. The case arose "in the funding context" where "the government 'has wide latitude to set spending priorities.'" *Id.* at 103 (quoting *Finley*, 524 U.S. at 588). Because the certification requirement addressed only the terms on which the government would disburse its own funds, the Fourth Circuit could not "conclude . . . that a substantial number of the Certification Provision's applications [would] be unconstitutional." *Id.* at 104 (citation modified). The same reasoning applies here.

The district court addressed the State's argument for the first time in its order denying a stay pending appeal. Dkt. 59 at 1–2. The order reasons that the "ordinary business purpose" exception indicates "that the statute is designed to respond to organizations' advocacy, rather than regulate their commercial conduct." *Id.* at 2. This is a non-sequitur. The statute does not "regulate" any private party—it simply regulates how the State will choose to invest its own funds. In the same way that a government does not violate the First Amendment by not acquiring books for a public library, *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc), the State does not violate the First Amendment by choosing not to invest its funds with financial companies that boycott fossil fuel companies.

### B. Because the State is acting as a market participant rather than a regulator, the vagueness doctrine does not warrant facial invalidation.

The district court also erroneously declared SB13 unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause. Dkt. 50 at 9–11.

The vagueness doctrine is designed to prevent statutes from "forbid[ding] or requir[ing] the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application" on pain of criminal or civil sanctions. *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961). The doctrine serves two purposes: ensuring fair notice of what conduct will trigger punishment and guarding against arbitrary enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). Both concerns apply to "prohibitions" and their "enforcement," *id.* at 108, and presuppose a coercive regulatory regime in which private parties risk legal liability for guessing wrong.

Those concerns are substantially diminished when the government acts as a "patron rather than as [a] sovereign." *Finley,* 524 U.S. at 589. Under those circumstances "the consequences of imprecision are not constitutionally severe." *Id.* Accepting a vagueness challenge in that context would "call into question the constitutionality of . . . valuable [g]overnment programs." *Id.*

The Fourth Circuit reached the same conclusion two months ago in *NADOHE*, 167 F.4th at 100–02. There, the court rejected a facial vagueness challenge to an executive order directing agencies to terminate all "equity-related grants or contracts," even though the order never defined "equity-related." *Id.* at 101–02. The Fourth Circuit acknowledged that the term was "opaque" but held that *Finley*

foreclosed the challenge: "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 102 (citation omitted). The court emphasized that the provision "doesn't ask anything of [plaintiffs], nor does it regulate private conduct." *Id.* at 101. "Instead, it instructs the President's subordinates to act." *Id.* Because "courts should afford greater latitude for vagueness in funding decisions than they would in a criminal statute or regulatory scheme," the court held that facial invalidation was unwarranted. *Id.* at 102 (citation modified).

**1. Neither Chapter 809 nor Chapter 2276 is unconstitutionally vague.**

SB13 survives plaintiff's vagueness challenge because it does not regulate private conduct or speech; it merely instructs state entities how to allocate state funds.

Chapter 809's key definitions—"boycott energy company" and "listed financial company"—are used only to determine which publicly traded securities Texas's pension and school funds will hold in their own portfolios. No private firm faces fines, criminal charges, or liability. The only consequence is that specified state entities must consider selling a covered firm's securities and refraining from acquiring new ones, unless they determine that divestment would harm beneficiaries. §§ 809.053–.057. Chapter 2276 is even narrower: If a company is uncertain whether its activities constitute a "boycott," it may refrain from bidding on covered contracts or discuss its practices with the contracting agency, without risking any sanction. The only consequence is ineligibility for state-procurement contracts. *See Finley*, 524 U.S. at 588–89. Neither provision creates the kind of coercive regime in which vagueness concerns are most acute.

Moreover, SB13 contains internal limiting principles that cabin any arguable uncertainty. The definition of "boycott energy company" applies only when actions are taken "without an ordinary business purpose." § 809.001(1). A firm that declines to invest in fossil fuels for risk-adjusted return, diversification, or other ordinary investment reasons is, by definition, outside the statute. And the statute's fiduciary overrides ensure that even listed firms' securities may remain in state portfolios when divestment would harm beneficiaries. §§ 809.005, .056.

ASBC's own declarants cannot plausibly claim that the statute is vague as applied to them. Etho's CEO attested that "the Etho Index screens out fossil fuel companies" and "avoids investing in companies that explore and produce fossil-fuel based energy." Dkt. 39-2, ¶¶ 10, 27. Sphere's CEO similarly attested that its fund "does not invest in fossil fuel companies." Dkt. 39-3, ¶ 6. Firms that openly refuse to invest in fossil-fuel companies cannot seriously maintain that they do not know whether they are "refusing to deal with" energy companies for purposes of § 809.001(1). The State does not violate the First Amendment by choosing not to do business with these companies.

Nor does the vagueness doctrine permit a facial challenge by parties whose conduct falls squarely within a statute's core. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (citation modified)); *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982) (explaining that a plaintiff cannot raise a facial vagueness challenge unless "the enactment is impermissibly vague in all of its applications").

Any remaining line-drawing difficulty at the margins is confined to a small category of large vendors, only while they are under contract with Texas, and only as to whether they will receive state-procurement dollars.

**2. The district court erred by applying the wrong legal standard.**

The district court declared SB13 vague because "the term 'penalize' could easily apply to political speech" and because the Comptroller "provided no explanation" for certain listing decisions. Dkt. 50 at 10–11 (citation modified). But neither observation accounts for (or even acknowledges) the market-participant context. In *Finley*, the Supreme Court rejected a virtually identical argument: that terms like "decency" and "respect for the diverse beliefs and values of the American public" were too subjective to guide NEA grant-making. 524 U.S. at 585–89. The Court acknowledged that those terms would have raised "substantial vagueness concerns" if they had "appeared in a criminal statute or regulatory scheme." *Id.* at 588. But because they appeared in the context of selective government subsidies, "the consequences of imprecision [were] not constitutionally severe." *Id.* at 588–89.

The same reasoning applies here. Firms remain free to boycott fossil fuels and advocate against them; they simply may not demand that Texas invest in their securities or receive large state-procurement contracts while doing so. The district court's failure to apply *Finley*'s patron-versus-sovereign framework led it to demand a level of statutory precision that the Due Process Clause does not require in the proprietary context.

The district court also ignored that ASBC's members are indisputably within the core of the statutory definition, which forecloses a facial vagueness challenge. *See Hoffman Estates*, 455 U.S. at 495; *Humanitarian Law Project*, 561 U.S. at 18–20.

To the extent ASBC's members believe the Comptroller has misapplied the statute's definitions in particular listing decisions—for example, by disregarding asserted "ordinary business purpose" justifications—their remedy is an as-applied challenge to those party-specific decisions, not facial invalidation of the entire statute. The Fourth Circuit made precisely this point in *NADOHE*: "[I]f government actors have terminated grants or contracts without regard to their legality, then plaintiffs can sue those actors for terminating those contracts." 167 F.4th at 102 (citation modified). "The Provision's plain text doesn't terminate any contracts, nor does it directly regulate non-governmental conduct, so by relying on this enforcement evidence, plaintiffs blur the line between a facial and as-applied challenge." *Id.*

Once SB13 is properly understood as a set of proprietary portfolio-management and purchasing criteria, the vagueness doctrine does not warrant facial invalidation.

* * *

The analysis in the order granting summary judgment does not address the key aspect of SB13: It concerns only the State as a marketplace participant and not the State as a regulator. This different context demonstrates that State has a likelihood of success on appeal.

### C. At a minimum, the district court erred by entering a universal injunction.

The district court's remedy exceeded what was necessary to redress Plaintiffs' injuries and thus what was permissible under the law. The court ordered:

> It is further DECLARED that SB13 is unconstitutional under the First and Fourteenth Amendments of the United States Constitution and ORDERED that Defendants are enjoined from implementing or enforcing SB13, as codified at Tex. Gov't Code §§ 809.001–.102 and Tex. Gov't Code §§ 2276.001–.002.

Dkt. 50 at 11–12. That order bars Defendants from enforcing SB13 against anyone, not just ASBC, Etho, and Sphere. It thus operates as a universal permanent injunction, forbidding the State from applying the statute to the hundreds of financial companies subject to Chapter 809 and the thousands of vendors subject to Chapter 2276, none of whom are parties to this lawsuit.

Such relief "falls outside the bounds of a federal court's equitable authority." *CASA*, 606 U.S. at 847. At a minimum, this Court should vacate the injunction "to the extent that [it is] broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861. The appropriate remedy, if any relief were warranted, would be an injunction limited to the Comptroller's listing of Etho and Sphere and to the application of Chapter 2276 to ASBC's members who seek covered procurement contracts—not a blanket prohibition on enforcement of SB13 statewide.

## II. The Remaining Factors Favor a Stay.

The remaining stay factors also all favor the State. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). That harm is particularly acute here, where the injunction strips Texas of control over how it manages its own pension and school-fund portfolios and how it allocates its own procurement spending.

The injunction upends the status quo. SB13 has been in effect since 2021. Over 200 state agencies and 1,826 cooperative purchasing members have integrated its requirements into their procurement processes. Dkt. 55-1, ¶ 2. State retirement and investment funds, as well as the Texas Treasury Safekeeping Trust Company (which manages approximately $25 billion in state operating funds, including the Economic Stabilization Fund), have structured their portfolios in reliance on the Comptroller's divestment list. *Id.* ¶ 5. The State has issued instructions to bond counsel and investment managers accordingly. The injunction forces the State to reverse all of this—retraining personnel, revising contracts, unwinding investment positions, and reacquiring securities it divested—only to do it all over again if this Court upholds SB13 on appeal. *Id.* ¶7. Worse, the injunction places state officials in an impossible position: Any investment decision involving a company that formerly appeared on the divestment list will be subject to judicial second-guessing, on pain of contempt, even if the decision rests on an independent financial analysis having nothing to do with SB13.

Every day the injunction remains in effect, state funds are barred from implementing the Legislature's investment criteria, potentially requiring them to continue holding the securities of financial companies whose strategies are aimed at harming Texas's core industries. The irreparable harm to the State is compounded by the universal scope of the injunction, which bars enforcement of SB13 not only as to Etho Capital LLC and Our Sphere, Inc. but as to all financial companies and vendors. *CASA*, 606 U.S. at 847.

The balance of the equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. The public has a strong interest in permitting the State to manage its own assets and set criteria for its own purchases, just as any private investor or purchaser would. That interest is especially weighty given Texas's well-documented economic dependence on the fossil-fuel industry and the Legislature's determination that state dollars should not support efforts to undermine that industry.

Conversely, a stay will not "substantially injure" ASBC or its members. *Id.* at 426. Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.), a stay of the injunction would cause any loss of First Amendment freedoms. SB13 does not prohibit anyone from speaking, advocating, or associating. ASBC's members remain free to criticize fossil fuels, participate in climate strikes, and associate with like-minded organizations. The only consequence of the statute is that firms engaged in boycotting fossil fuels do not receive investments of state funds.

Plaintiffs did not obtain a preliminary injunction and have not suffered an injury from the State's enforcement of the law while the case was pending in the district court. They will not suffer if this Court stays the permanent injunction pending resolution of this appeal.

Because the State is likely to succeed on the merits and Plaintiffs face no cognizable First Amendment harm from a stay, all four *Nken* factors favor staying the injunction pending appeal.

## Conclusion

The Court should stay the injunction pending appeal.

Respectfully submitted.


Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

/s/ William R. Peterson
William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

Cameron Fraser
Assistant Solicitor General

Counsel for Defendants–Appellants

## Certificate of Conference

On April 14, 2026, counsel for Appellant conferred with counsel for Appellees, who stated that Appellees oppose the relief requested in this motion and intend to file a response.

/s/ William R. Peterson
William R. Peterson

## Certificate of Service

On April 15, 2026, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ William R. Peterson
William R. Peterson

## Certificate of Compliance

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,016 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ William R. Peterson
William R. Peterson