**No. 26-50111**

# In the United States Court of Appeals for the Fifth Circuit

American Sustainable Business Council,
Plaintiff–Appellee,

v.

Glenn Hegar, in his official capacity as Texas Comptroller of Public Accounts; Ken Paxton, Attorney General, State of Texas,
Defendants–Appellants.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLANTS

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

William R. Peterson
Solicitor General
William.Peterson@oag.texas.gov

Cameron Fraser
Assistant Solicitor General

*Counsel for Defendants–Appellants*

## Certificate of Interested Persons

No. 26-50111

American Sustainable Business Council,
Plaintiff–Appellee,

v.

Glenn Hegar, in his official capacity as Texas Comptroller of Public Accounts; Ken Paxton, Attorney General, State of Texas,
Defendants–Appellants.

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ William R. Peterson
William R. Peterson
*Counsel for Defendants–Appellants*

## Statement Regarding Oral Argument

This appeal involves a constitutional challenge to state law and presents important and complex issues regarding the First Amendment and Due Process Clause when the State acts as a participant in the marketplace rather than as a regulator. Oral argument would aid this Court's decisional process.

# Table of Contents

Page

Certificate of Interested Persons ..... i
Statement Regarding Oral Argument ..... ii
Table of Authorities ..... v
Statement of Jurisdiction ..... 1
Issues Presented ..... 2
Introduction ..... 3
Statement of the Case ..... 4
Summary of the Argument ..... 11
Standard of Review ..... 13
Argument ..... 14
- I. ASBC Lacks Associational Standing to Challenge the Procurement Provision, Which Does Not Apply to Its Identified Members ..... 14
- II. SB13 Does Not Violate the First Amendment. ..... 17
  - A. Application of SB13 to economic decisions that discriminate against fossil fuel companies does not violate the First Amendment. ..... 18
    - 1. Purchasing decisions at the heart of a boycott are not protected by the First Amendment. ..... 18
    - 2. SB13 involves the State regulating its own investment and purchasing decisions as a marketplace participant, not the State as a regulator. ..... 19
  - B. ASBC's challenges to the "any action" clause do not justify the relief awarded by the district court ..... 23
    - 1. The district court misinterpreted the "any action" clause. ..... 24
    - 2. The district court failed to conduct the analysis required by *Moody v. NetChoice*. ..... 27
    - 3. The district court erred by enjoining the statute as a whole and not severing any unconstitutional portion. ..... 28
- III. SB13 Is Not Unconstitutionally Vague. ..... 29

A. ASBC lacks associational standing to raise a vagueness challenge because its identified members unambiguously fall within the statute. .......... 29

B. SB13 is not unconstitutionally vague. .......... 31

1. SB13 governs how the State spends its own funds; it does not regulate private parties. .......... 31

2. The district court erred in analyzing vagueness. .......... 34

IV. The District Court Erred by Entering a Universal Injunction. .......... 38

Conclusion and Prayer .......... 39

Certificate of Service .......... 40

Certificate of Compliance .......... 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........ 21
*Ark. Times LP v. Waldrip*,
37 F.4th 1386 (8th Cir. 2022) ........ 3, 17, 18, 24, 25
*Barshop v. Medina Cnty. Underground Water Conservation Dist.*,
925 S.W.2d 618 (Tex.1996) ........ 25
*Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.* (*Boston Harbor*),
507 U.S. 218 (1993) ........ 19-20
*Blum v. Holder*,
744 F.3d 790 (1st Cir. 2014) ........ 31
*Cammarano v. United States*,
358 U.S. 498 (1959) ........ 21
*City of Chicago v. Morales*,
527 U.S. 41 (1999) ........ 37
*City of San Antonio v. Realme*,
No. 24-0864, 2026 WL 706013 (Tex. Mar. 13, 2026) ........ 25
*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 15
*Cramp v. Bd. of Pub. Instruction*,
368 U.S. 278 (1961) ........ 31
*Fairchild v. Liberty Indep. Sch. Dist.*,
597 F.3d 747 (5th Cir. 2010) ........ 8, 11, 14, 15, 16
*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ........ 32
*Greater Houston P'ship v. Paxton*,
468 S.W.3d 51 (Tex. 2015) ........ 26
*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ........ 38
*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ........ 12, 29, 35

*Hughes v. Alexandria Scrap Corp.*,
426 U.S. 794 (1976) ........ 20
*Iowa Safe Schs. v. Reynolds*,
172 F.4th 589 (8th Cir. 2026) ........ 37
*Kariuki v. Tarango*,
709 F.3d 495 (5th Cir. 2013) ........ 13
*La Union del Pueblo Entero v. Abbott*,
167 F.4th 743 (5th Cir. 2026) ........ 31-32, 34
*King v. Burwell*,
576 U.S. 473 (2015) ........ 36
*Lance v. Coffman*,
549 U.S. 437 (2007) ........ 16
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 14
*Machete Productions, L.L.C. v. Page*,
809 F.3d 281 (5th Cir. 2015) ........ 33, 34
*Maher v. Roe*,
432 U.S. 464 (1977) ........ 22
*Marks v. St. Luke's Episcopal Hosp.*,
319 S.W.3d 658 (Tex. 2010) ........ 25
*McDonald v. FEC*,
No. 25-10830, 2026 WL 581816 (5th Cir. Mar. 2, 2026) ........ 16
*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 2, 3, 11, 24, 27, 28
*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ........ 18
*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ........ 12, 32, 33, 34
*National Association of Diversity Officers in Higher Education (NADOHE) v. Trump*,
167 F.4th 86 (4th Cir. 2026) ........ 33, 34, 37
*Neese v. Becerra*,
123 F.4th 751 (5th Cir. 2024) ........ 13
*Oakes Farms Food & Distrib. Servs., LLC v. Adkins*,
154 F.4th 1338 (11th Cir. 2025) ........ 19
*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ........ 32

*Quick v. City of Austin*,
7 S.W.3d 109 (Tex. 1998) ........ 25
*Reeves, Inc. v. Stake*,
447 U.S. 429 (1980) ........ 20
*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) ........ 21
*Roark & Hardee LP v. City of Austin*,
522 F.3d 533 (5th Cir. 2008) ........ 31
*Rumsfeld v. F. for Acad. & Institutional Rts., Inc. (FAIR)*,
547 U.S. 47 (2006) ........ 19, 27
*Rust v. Sullivan*,
500 U.S. 173 (1991) ........ 22
*Spirit Aerosystems, Inc. v. Paxton*,
142 F.4th 278 (5th Cir. 2025) ........ 13
*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........ 14
*Texas v. Becerra*,
89 F.4th 529 (5th Cir. 2024). ........ 13
*Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*,
952 S.W.2d 454 (Tex. 1997) ........ 29
*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 14
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 12, 38, 39
*United Healthcare Ins. Co. v. Davis*,
602 F.3d 618 (5th Cir. 2010) ........ 20
*United States v. Hansen*,
599 U.S. 762 (2023) ........ 14
*United States v. Jubert*,
139 F.4th 484 (5th Cir. 2025) ........ 16
*United States v. Stevens*,
559 U.S. 460 (2010) ........ 9
*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ........ 29
*White v. Mass. Council of Constr. Emps., Inc.*,
460 U.S. 204 (1983) ........ 20

*Woodlands Pride v. Paxton*,
168 F.4th 293 (5th Cir. 2026) ........ 28

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:
amend. I ........ *passim*
amend. XIV ........ 38
art. III ........ 8, 11, 14, 15, 16
11 U.S.C. § 363 ........ 35
28 U.S.C.:
§ 1292 ........ 1
§ 1331 ........ 1
Tex. Gov't Code:
§ 312.013 ........ 29
§ 485.022 ........ 33
§ 809.001 ........ 2, 4, 5, 9–11, 17, 24, 26, 30, 36
§ 809.102 ........ 2, 4, 10
§ 809.005 ........ 21, 36
§ 809.051 ........ 5
§ 809.053 ........ 4, 5
§ 809.056 ........ 21, 36
§ 2276.001 ........ 2, 4, 10
§ 2276.002 ........ 2, 4, 5, 8, 10, 15

**Other Authorities:**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 208 (2012) ........ 25
U.C.C. § 1-201 ........ 35
*Texas Is the Top State for Oil and Gas Production and for Wind-Powered Generation*, Tex. Econ. Dev. Corp. (Feb. 6, 2025), https://business-intexas.com/rankings/texas-is-the-top-state-for-oil-and-gas-production-and-for-wind-powered-generation/ ........ 28

## Statement of Jurisdiction

The district court had federal-question jurisdiction over this suit asserting claims under Section 1983. 28 U.S.C. § 1331.

The district court entered an order permanently enjoining SB13 on February 3, 2026. ROA.733–34. Defendants filed a timely notice of appeal on February 6, 2026. ROA.735–36. This Court has jurisdiction under Section 1292(a)(1) of Title 28 of the United States Code.

## Issues Presented

Two aspects of Texas Senate Bill 13 (SB13) are at issue in this appeal: Sections 809.001–102 regulate investments by Texas's pension and school funds in publicly traded securities (the "Divestment Provision"); and Sections 2276.001–002 regulate the State's purchase of goods and services through large procurement contracts (the "Procurement Provision"). Tex. Gov't Code §§ 809.001–102, 2276.001–002. Both provisions rely on the same definition of "boycott energy company." *Id.* §§ 809.001, 2276.001. The issues presented are:

1. Whether ASBC has associational standing to challenge the Procurement Provision when ASBC's only identified members do not seek state procurement contracts and are not injured by the Procurement Provision.
2. Whether SB13's definition of "boycott energy company" is facially overbroad, including whether the district court erred by (a) interpreting the "any action" clause to extend beyond commercial conduct; (b) failing to conduct the analysis required by *Moody v. NetChoice*; and (c) in the alternative, not severing the "any action" clause.
3. Whether SB13—which governs Texas's own investment and purchasing decisions and imposes no fines, criminal penalties, or civil liability on any private party—is unconstitutionally vague, including whether ASBC has standing to assert a vagueness challenge when the statute's application to its identified members is unambiguous.
4. Whether the district court erred by entering a universal injunction.

# Introduction

Senate Bill 13 governs how the State of Texas invests and spends its own money. The Texas Legislature believes that fossil fuel companies are good investments and good contracting partners. There is no violation of the First Amendment when the State chooses to spend its own money in this manner, and there is no First Amendment right to compel the State to participate in a boycott of fossil fuel companies.

The district court reached a contrary conclusion because it misinterpreted the statute. As the en banc Eighth Circuit indicated in addressing a similar statute (and neither the district court nor the Appellee denies), the refusal to engage in commercial transactions with fossil fuel companies is non-expressive commercial conduct. *Ark. Times LP v. Waldrip*, 37 F.4th 1386 (8th Cir. 2022) (en banc). But the district court erroneously interpreted SB13's residual clause—"otherwise taking any action intended to penalize"—to extend beyond commercial conduct to speech. ROA.732.

The State explained below that this reading was incorrect. Interpretive canons such as constitutional avoidance, *ejusdem generis*, and *noscitur a sociis* confirm the narrower interpretation. The en banc Eighth Circuit correctly applied the first two canons in rejecting a similar argument. *Ark. Times*, 37 F.4th at 1393–94. But these canons of construction went unaddressed by the district court.

And despite the undisputed constitutional applications of SB13, the district court failed to conduct the analysis required by *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), before holding the law facially unconstitutional as overbroad. This Court should reverse and render summary judgment for Defendants.

## Statement of the Case

In 2021, the Texas Legislature enacted SB13 with overwhelming bipartisan support. The law regulates two types of state financial activity: (1) the management of publicly traded securities held by Texas's pension and school funds (the "Divestment Provision," Tex. Gov't Code §§ 809.001–102); and (2) the State's purchase of goods and services through large procurement contracts (the "Procurement Provision," *id.* §§ 2276.001–002). SB13 does not impose any civil or criminal liability on any private party. The statute regulates only commercial activities by the State using the State's funds. *See id.* § 809.053(d) ("the state governmental entity shall . . ."); *id.* § 2276.002(b) ("a governmental entity may not . . .").

SB13 limits the State's contractual relationships with companies that "boycott energy companies."

> "Boycott energy company" means, without an ordinary business purpose, refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with a company because the company:
>
> > (A) engages in the exploration, production, utilization, transportation, sale, or manufacturing of fossil fuel-based energy and does not commit or pledge to meet environmental standards beyond applicable federal and state law; or
> >
> > (B) does business with a company described by Paragraph (A).

*Id.* § 809.001(1). This brief refers to companies described in Paragraphs (A) and (B) as "fossil fuel companies."

The Procurement Provision is straightforward. With narrow exceptions, a governmental entity may not enter into a contract for $100,000 or more with a company

with 10 or more full-time employees unless the company verifies that it "does not boycott energy companies" and "will not boycott energy companies during the term of the contract." *Id.* § 2276.002(b).

The Divestment Provision regulates the investments of six state governmental entities: the Employees Retirement System, the Teacher Retirement System, the Texas Municipal Retirement System, the Texas County and District Retirement System, the Texas Emergency Services Retirement System, and the Permanent School Fund. *Id.* § 809.001(7).

The Comptroller must compile a list of "financial companies that boycott energy companies" based on publicly available information and, if he chooses, written verification requests to the companies. *Id.* § 809.051(a); *see also* ROA.393–402 (response to information request sent by the Comptroller). Each state fund must then identify its holdings in listed companies, notify those companies, and, if the companies do not stop boycotting within 90 days, "sell, redeem, divest, or withdraw all publicly traded securities of the financial company." Tex. Gov't Code § 809.053.

The Comptroller publishes two lists: Annex 1 lists parent companies that "have taken actions at the corporate level that have been determined to be 'boycotting' under Texas law." ROA.585. Regulated governmental entities must "divest from direct holdings in the financial companies listed in Annex 1" and from all "investment funds managed by financial companies listed in Annex 1." ROA.585.

Annex 2 lists "individual funds," ROA.572, "that include a specific prohibition or limitation on fossil fuel-based energy investments," ROA.582; *see also* ROA.583 ("[W]e explicitly asked fund managers to identify their funds that have a policy,

procedure, or investment guideline restricting or prohibiting investing in the fossil fuel-based energy industry."). These funds listed in Annex 2 "constitute only a part, perhaps a small part, of a larger corporate entity." ROA.585.

***ASBC sues to challenge SB13***

In August 2024, years after SB13 took effect, Plaintiff American Sustainable Business Council (ASBC) filed this suit to challenge the law. ASBC is a membership organization that represents over 200,000 businesses in advocating for and advancing sustainable business practices. ROA.366–67. ASBC raised facial challenges to SB13, contending that (1) the Divestment Provision violates the First Amendment; (2) the Divestment Provision is unconstitutionally vague; (3) the Procurement Provision violates the First Amendment; and (4) the Procurement Provision is unconstitutionally vague. ROA.236–40.[1]

ASBC relies on associational standing based on two identified members: Etho Capital LLC and Our Sphere, Inc. ROA.206. Both companies maintain investment funds that screen out fossil-fuel companies, regardless of how profitable, safe, or otherwise desirable such an investment would be. Etho Capital created the "Etho Fund," which invests in companies on an index that "screens out fossil fuel companies." ROA.370–71. Etho Capital admits that it "avoids investing in companies that explore and produce fossil fuel-based energy." ROA.374.

[1] ASBC also contends that the provision for an award of attorney's fees constitutes an unconstitutional infringement of the right of access to the courts. ROA.240. That claim remains pending before the district court.

Sphere created the Sphere Fund, which similarly "does not invest in fossil fuel companies." ROA.377. "Companies with a risk profile of exposure to the fossil fuel industry and other metrics are then excluded from the investable universe of companies." ROA.377. Sphere also "votes its shares in the long-term best financial interest of shareholders at companies that are not in the fossil fuel industry." ROA.377. Sphere admits that it "forego[es] investments in fossil fuel companies." ROA.380.

Unsurprisingly, both the Etho Fund and the Sphere Fund are listed on Annex 2 by the Comptroller because they expressly boycott fossil fuel companies by refusing to invest in them. *See* ROA.582 ("[T]he goal was to identify the subset of funds that include a specific prohibition or limitation on fossil fuel-based energy investment[.]"); ROA.585 (discussing Annex 2); ROA.510–14 (listing of funds).[2]

ASBC did not seek a preliminary injunction, and the Comptroller continued enforcing SB13 while this case was pending.

In January 2025, ASBC moved for partial summary judgment on three counts: its First Amendment challenges to both provisions and its vagueness challenge to the Divestment Provision.[3] ROA.338.

Defendants responded and cross-moved for summary judgment. ROA.655. Defendants first noted that ASBC lacks associational standing to challenge the

[2] Both funds are listed under their former names. *See* ROA.374 ("Etho Climate Leadership ETF"); ROA.381 ("Sphere 500 Fossil Free Fund").

[3] It is unclear why ASBC did not move for partial summary judgment regarding the vagueness of the Procurement Provision. Its vagueness arguments (and the district court's analysis) rely on the statutory definition of "boycott energy company," which both provisions share.

Procurement Provision because it has not identified any member subject to that provision. *See* ROA.668 ("Plaintiff did not allege that Etho or Sphere ever have, or ever will, enter into a governmental contract for goods or services that would fall under § 2276.002's ambit.").

On the merits, Defendants explained that SB13 does not concern "expressive conduct protected by the First Amendment." ROA.670. Particularly applying the canons of constitutional avoidance and *ejusdem generis*, the statute's residual "any action" clause "only prohibits economic discrimination." ROA.674–75. Moreover, SB13 does not involve the State acting in its capacity as sovereign or regulator but instead concerns the State as a marketplace participant choosing how to invest its money and with whom to contract. ROA.679.

***The District Court grants partial summary judgment and permanently enjoins enforcement of SB13***

The district court granted ASBC's motion for partial summary judgment in February 2026. ROA.733.

With respect to standing, the district court did not find that Etho Capital or Sphere has suffered or will suffer any injury traceable to the Procurement Provision. ROA.728. The district court instead held that uninjured parties have Article III standing to raise "facial challenges to restrictions of expression" of others. ROA.728 (citing *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir. 2010)).

On the merits, the State's arguments went largely unaddressed. In discussing overbreadth, the district court did not deny that the "refusing to deal with" and "terminating business activities with" portions of the "boycott" definition concern

non-expressive conduct. ROA.729–31. Its overbreadth analysis focused entirely on the third clause of the definition: "taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with" a fossil-fuel company." Tex. Gov't Code § 809.001(1). Without addressing the canons of construction invoked by the State, the district court declared that this phrase "includes, for example, speaking about the risks posed by fossil fuels, advocating against reliance on fossil fuels, and associating with like-minded organizations." ROA.730.

Without discussing SB13's constitutional applications, the district court then asserted that the statute's "application to protected speech is 'substantial,' both in absolute terms and 'in relation to the statute's plainly legitimate sweep.'" ROA.731 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

The district court also held SB13 unconstitutionally vague. The district court found that each of the three clauses in the boycott definition—"refusing to deal with," "terminating business activities with," and "taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with" fossil-fuel companies—is "undefined and not susceptible to objective measurement or determination." ROA.731–32. As with overbreadth, its analysis of vagueness focused on the residual clause. Without discussing the interpretive canons invoked by the State (or the State's explanation of the statute's meaning), the district court stated that "the term 'penalize' could easily apply to political speech intending to persuade others to economically boycott or otherwise 'penalize' fossil fuel companies." ROA.732 (citation modified).

The district court found the statute's "ordinary business purpose" exception problematic. ROA.732–33. The opinion appears to conflate the "purpose" of conduct with whether conduct is expressive for purposes of the First Amendment: "It is admittedly difficult to imagine what sort of conduct is both not an 'ordinary business purpose' and not an expression protected by the First Amendment, such that that conduct could fall within SB 13's 'boycott' definition." ROA.733. The opinion also suggests that the Comptroller was required to accept assertions by Etho Capital and Sphere that their ideological refusal to invest in any fossil fuel company was an "ordinary business purpose." ROA.733.

The district court declared SB13 unconstitutional and entered a permanent, universal injunction: "Defendants are enjoined from implementing or enforcing SB 13, as codified at Tex. Gov't Code §§ 809.001–809.102 and Tex. Gov't Code §§ 2276.001–2276.002." ROA.734.

Defendants filed a timely notice of appeal on February 6. ROA.735.

On February 27, Defendants moved in the district court for a stay pending appeal. D. Ct. Dkt. 55. The district court denied that motion on April 14, D. Ct. Dkt. 59, and Defendants moved for a stay in this Court on April 15, CA5 Dkt. 35. That motion remains pending.

## Summary of the Argument

ASBC lacks associational standing to challenge the Procurement Provision. The overbreadth doctrine relaxes only the prudential bar on asserting third-party rights. It does not displace Article III's irreducible constitutional requirement that the plaintiff suffer an injury from the challenged statute. *Fairchild*, 597 F.3d at 754. ASBC rests its associational standing exclusively on two members, Etho Capital and Sphere, both of which are investment companies that have created index investment funds. Neither sells goods or provides services to state agencies, neither has identified a contract it was denied or a solicitation it was excluded from, and neither has expressed any intent to seek a covered contract. Because the Procurement Provision does not even arguably proscribe the conduct of either of ASBC's identified members, ASBC cannot satisfy Article III's requirements.

With respect to overbreadth, the district court appeared to accept, as the Eighth Circuit held, that SB13 can constitutionally apply to commercial conduct such as "refusing to deal with" and "terminating business activities with" fossil fuel companies. Tex. Gov't Code § 809.001(1). The district court's analysis focuses entirely on the residual, "any action" clause, but the canon of *ejusdem generis* (reinforced by constitutional avoidance) requires "any action" to be of the same type as the listed prohibitions. The district court misinterpreted this provision.

And even if the district court's analysis were correct, ASBC's facial challenge required the district court to "determine [the] law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." *NetChoice*, 603 U.S. at 718. The district court did not conduct this inquiry.

Nor did the district court sever any unconstitutional portion of the statute, as Texas law would require.

With respect to its vagueness arguments, ASBC lacks associational standing because the conduct of its identified members is clearly proscribed. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010). In any event, because the statute concerns the State spending its own money, vagueness concerns are minimal, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998), and as discussed above, the "any clause" clause is readily understood as limited to commercial conduct, just like the rest of the statute.

Finally, the district court erred by entering a universal permanent injunction, which exceeds the equitable powers of the federal courts. *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). At a minimum, the injunction should be vacated and remanded for entry of relief no broader than necessary to provide complete relief to each plaintiff with standing to sue.

## Standard of Review

This Court reviews the district court's standing determination de novo. *Neese v. Becerra*, 123 F.4th 751, 753 (5th Cir. 2024) (per curiam).

This Court reviews the grant of summary judgment de novo. *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013).

The district court's decision to grant a permanent injunction is reviewed for abuse of discretion, but the legal conclusions underlying that decision are reviewed de novo. *Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 284 (5th Cir. 2025). This Court reviews the scope of an injunction de novo. *Texas v. Becerra*, 89 F.4th 529, 537 (5th Cir. 2024).

## Argument

### I. ASBC Lacks Associational Standing to Challenge the Procurement Provision, Which Does Not Apply to Its Identified Members.

To establish Article III standing, a plaintiff must demonstrate an injury in fact that is fairly traceable to the defendant's challenged conduct and likely to be redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Article III's injury-in-fact requirement is constitutional and irreducible; it applies to "each claim" a plaintiff seeks to "press and for each form of relief that [is sought.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The First Amendment overbreadth doctrine does not dispense with that requirement. It relaxes only the prudential bar on the assertion of third-party rights, not Article III's constitutional demand that the plaintiff has suffered, or is about to suffer, a concrete injury from the challenged statute. *See Fairchild*, 597 F.3d at 754 ("Article III standing retains rigor even in an overbreadth claim."); *see also United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (explaining that "overbreadth is strong medicine that is not to be casually employed" (citation modified)).

ASBC relies on associational standing, ROA.693, which requires, at a minimum, that at least one identified member has Article III standing in the member's own right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009). ASBC has identified only two members: Etho Capital LLC and Our Sphere, Inc. ASBC has associational standing only to the extent that these members have standing.

Because ASBC failed to demonstrate that either Etho Capital or Sphere has standing to challenge the Procurement Provision, ASBC lacks standing as well.

The Procurement Provision applies to a narrow category of covered transactions: contracts (1) between a governmental entity and a company with ten or more full-time employees, (2) with a value of $100,000 or more, (3) paid from public funds, (4) for the provision of goods or services. Tex. Gov't Code § 2276.002(a). It imposes no requirements outside that procurement relationship.

Etho Capital and Sphere manage investment funds that screen out fossil-fuel companies. Neither sells goods or provides services to state agencies. Neither alleges (much less presents evidence) that it has ever sought—or has any present intention to seek—a state contract subject to Chapter 2276. Neither has identified a specific contract it was denied, a solicitation it was excluded from, or a plan to bid on a covered contract. On this record, there is no "certainly impending" injury, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), and no credible threat of enforcement of the Procurement Provision against Etho Capital or Sphere.

In concluding to the contrary, the district court relied on the relaxed standing rule for facial First Amendment overbreadth challenges. *See* ROA.728 (citing *Fairchild*, 597 F.3d at 754). But that rule cannot do the work the district court asked of it. *Fairchild* held that the overbreadth doctrine allows federal courts to "relax . . . prudential limitations" and allow "yet-unharmed litigants" to vindicate the rights of third parties, but "Article III standing retains rigor even in an overbreadth claim." 597 F.3d at 754.

Indeed, *Fairchild* evaluated whether the plaintiff had "shown the requisite injury-in-fact." *Id.* This Court held that the plaintiff satisfied Article III because her own speech had been chilled at a school board meeting, a cognizable constitutional

injury. *See id.* at 755 ("Fairchild asserts that she had to [rein] in her own speech during the August 16 comment session."). Fairchild showed "that she [wa]s seriously interested in engaging in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Id.* (citation modified).

In a recent unpublished decision, this Court confirmed that it has "never held that [standing requirements] may be so relaxed as to permit a challenge to a law that does not even arguably proscribe any conduct of the plaintiff." *McDonald v. FEC*, No. 25-10830, 2026 WL 581816, at *3 (5th Cir. Mar. 2, 2026) (per curiam); *see also United States v. Jubert*, 139 F.4th 484, 492–93 (5th Cir. 2025) (noting the "oddity" of facial overbreadth challenges premised on potential First Amendment harm to third parties).

Application of these cases is straightforward. The Procurement Provision does not, even arguably, affect Etho Capital and Sphere, which have not alleged any interest in seeking procurement contracts with the State. As a result, ASBC lacks associational standing to challenge the Procurement Provision.

The district court erred by holding that Article III's injury requirement does not apply to facial First Amendment challenges. ROA.728. Under the district court's reasoning, any uninjured person could sue to "attack potentially overbroad statutes" and "prevent the statute from chilling the First Amendment rights of other parties." ROA.728 (quoting *Fairchild*, 597 F.3d at 754). The Supreme Court has long refused to allow the courts to serve as a forum for such generalized grievances. *Lance v. Coffman*, 549 U.S. 437, 439–40 (2007) (per curiam).

ASBC lacks associational standing to challenge the Procurement Provision, and this Court should render judgment vacating the injunction with respect to that provision and dismissing those claims for lack of subject matter jurisdiction.

## II. SB13 Does Not Violate the First Amendment.

On the merits, the district court erred in holding that both provisions of SB13 violate the First Amendment as overbroad. ROA.729–31. As the Eighth Circuit recognized, statutes like SB13 may be constitutionally applied to commercial conduct, *Arkansas Times*, 37 F.4th 1386 (upholding a similar law), including refusing to invest in fossil fuel companies.

Plaintiff's arguments and the district court's analysis rely on SB13's residual clause: "any action that is intended to penalize, inflict economic harm on, or limit commercial relations with" a fossil fuel company. Tex. Gov't Code § 809.001. *See* ROA.701 (ASBC: "The [Arkansas law] does not include SB 13's expansive clause prohibiting companies from 'taking any action that is intended to penalize,' among other things, fossil fuel companies."); ROA.729–30 (district court rejecting the argument that SB13 is "limited by its terms to only commercial conduct" because of the "any action" clause).

These arguments regarding the "any action" clause are incorrect and, in any event, do not justify the relief awarded by the district court.

### A. Application of SB13 to economic decisions that discriminate against fossil fuel companies does not violate the First Amendment.

It appears to be undisputed that the core of SB13—the definition of "boycott" as "refusing to deal with" and "terminating business activities with" fossil fuel companies—regulates commercial conduct and does not violate the First Amendment.

#### 1. Purchasing decisions at the heart of a boycott are not protected by the First Amendment.

As the en banc Eighth Circuit explained, refusals to deal are non-expressive commercial activities not protected by the First Amendment. *Arkansas Times*, 37 F.4th at 1392. Although "expressive activities *accompanying* a boycott" are protected by the First Amendment, "the purchasing decisions at the heart of a boycott" are not. *Id.* (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)).

*Arkansas Times* concerns an indistinguishable statute that prohibits public entities from contracting with companies that boycott Israel, which it defines as (1) "engaging in refusals to deal"; (2) "terminating business activities"; or (3) taking "other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories," "in a discriminatory manner." *Id.* at 1393. This statute, the Eighth Circuit held, "prohibits non-expressive commercial decisions, which are not protected under the First Amendment." *Id.* "It only prohibits economic decisions that discriminate against Israel" that "are not inherently expressive and do not implicate the First Amendment." *Id.* at 1394.

As the Supreme Court has explained, laws regulating discrimination in hiring regulate unexpressive conduct rather than speech: "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc. (FAIR)*, 547 U.S. 47, 62 (2006). Prohibitions on discrimination in transacting with fossil fuel companies similarly regulate conduct rather than speech.

This Court should follow the analysis of the Eighth Circuit and hold that the economic decisions regulated by SB13 do not implicate the First Amendment.

#### 2. SB13 involves the State regulating its own investment and purchasing decisions as a marketplace participant, not the State as a regulator.

Moreover, even if the economic decisions at issue in SB13 would otherwise implicate the First Amendment, SB13 merely regulates the use of the State's funds. The First Amendment "leaves room for the government's interests when it acts as an employer or marketplace consumer, rather than as a sovereign." *Oakes Farms Food & Distrib. Servs., LLC v. Adkins*, 154 F.4th 1338, 1343 (11th Cir. 2025).

As a participant in the marketplace, Texas can regulate its own purchasing and investment decisions in a way that it could not regulate the transactions of private parties. For example, in the labor context, *Machinists* preemption applies only when the State acts as a regulator, not when the State acts as a "proprietor" that "owns and manages property." *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated*

*Builders & Contractors of Mass./R.I., Inc.* (*Boston Harbor*), 507 U.S. 218, 227 (1993). The Supreme Court permits "the States to participate freely in the marketplace." *Id.* at 230.

Similarly, in the dormant Commerce Clause context, when a State "is purchasing or selling a product or service," the State "can choose its contracting partners as if it were a private party." *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 624 (5th Cir. 2010). In these circumstances, the State may "deal preferentially with in-state entities." *Id.* (citing *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809–10 (1976)); *see also White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 210–14 (1983) (holding that the market-participant doctrine permitted a city to require that city-funded projects employ city residents); *Reeves, Inc. v. Stake*, 447 U.S. 429, 436–37 (1980) (holding that a state-owned company could favor in-state purchasers).

Consider the Divestment Provision, which governs the State's investment decisions. The State of Texas wishes to invest in fossil fuel companies, consistent with the State's economic interests. If a private company—such as Etho Capital or Sphere—refuses to invest in fossil fuel companies in its funds, then Texas does not wish to invest in those funds as a factor in its overall investment evaluation. The provision does not require either Etho Capital or Sphere to cease boycotting fossil-fuel companies; it simply governs whether Texas's pension and school-fund assets will invest in their securities. The statute concerns the State's investment decisions as a market participant.

SB13's fiduciary overrides confirm that the statute reflects portfolio management, not viewpoint discrimination. Chapter 809 yields to fiduciary duty whenever

divestment would harm beneficiaries. Tex. Gov't Code §§ 809.005, .056. A state fund "is not subject to" Chapter 809's requirements if it "determines that the requirement would be inconsistent with its fiduciary responsibility." *Id.* § 809.005. And the divestment schedule may be delayed or halted entirely if "clear and convincing evidence" shows that divestment would cause a loss in the value of the fund's assets or a deviation from its benchmark. *Id.* § 809.056(a)–(b). These safeguards underscore that Chapter 809's core purpose is to guide the State's investment choices.

Etho Capital and Sphere have no First Amendment right to compel the State to participate in their boycotts or subsidize their boycotts with its investments. The Supreme Court has repeatedly "reject[ed] the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.'" *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 546 (1983) (quoting *Cammarano v. United States,* 358 U.S. 498, 515 (1959) (Douglas, J., concurring)). "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Id.* at 549. Even if the First Amendment protected the boycott of fossil fuel companies, Etho Capital and Sphere have no right to use the State's funds in their boycott.

Put another way, as part of a "government spending program," Texas is perfectly free to place conditions on its investments. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). Even when protected speech is involved, conditions become unconstitutional only when they "seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214–15.

These conditions fall squarely on the constitutional side of the line. Etho Capital complains, for example, that "Texas pension funds and other Texas governmental entities are forbidden from investing in and contracting with" its Etho Fund, which admittedly refuses to invest in fossil fuel companies. ROA.374; *see also* ROA.370 (describing it as "fossil fuel free"); *see also* ROA.374 (noting that it was included on the list); ROA.511 (listing the Etho Fund by its former name). Sphere similarly complains that Texas will not invest its money in the "Sphere Fund," which "does not invest in fossil fuel companies." ROA.377; *see also* ROA.381 (noting that the Comptroller listed "the Sphere Fund"); ROA.514 (listing the fund by its former name). The State's decision not to invest in the Etho Fund and Sphere Fund simply reflects how the State will invest its own money. "[T]he government may 'make a value judgment . . . [and] implement that judgment by the allocation of public funds.'" *Rust v. Sullivan*, 500 U.S. 173, 192–93 (1991) (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977)). There is no First Amendment right to compel Texas to make investments in funds that boycott fossil fuel companies. Nor is there a First Amendment right to compel Texas to invest its funds with companies that exercise proxy-voting rights contrary to the State's interests. *See* ROA.580 (noting the Comptroller's reliance on proxy-voting records).

The Comptroller's implementation of SB13 confirms that the statute regulates the State's investment decisions and the use of the State's money. The Comptroller publishes two lists: Annex 1 lists parent companies that "have taken actions at the corporate level that have been determined to be 'boycotting' under Texas law." ROA.585. Because these companies generally boycott fossil fuel companies, the

State will "divest from direct holdings in the financial companies listed in Annex 1" and from all "investment funds managed by financial companies listed in Annex 1." ROA.585. Only sixteen companies—not including Etho Capital or Sphere—are listed in Annex 1. ROA.509.

Annex 2 lists "funds that include a specific prohibition or limitation on fossil fuel-based energy investments." ROA.582; *see also* ROA.583 ("[W]e explicitly asked fund managers to identify their funds that have a policy, procedure, or investment guideline restricting or prohibiting investing in the fossil fuel-based energy industry."). These funds "constitute only a part, perhaps a small part, of a larger corporate entity." ROA.585. The Comptroller thus recognizes that a specific fund may boycott fossil fuel companies even though the larger corporate entity does not: "[T]he Comptroller may contract with companies related to funds listed in Annex 2 if they make the written verification required by chapter 809 of the Texas Government Code." ROA.585; *see also* ROA.586 ("[T]he statute does not prohibit a state agency or political subdivision from contracting with an entity that is affiliated with an entity that is listed in Annex 2.").

Ultimately, SB13 regulates how the State will invest its own money. Even if boycotting fossil fuel companies were expressive activity, there is no right for the State to subsidize this activity through its investments.

### B. ASBC's challenges to the "any action" clause do not justify the relief awarded by the district court.

The district court appeared to accept that SB13 is constitutional to the extent that its definition of "boycott" includes "refusing to deal with" and "terminating

business activities with" fossil fuel companies. Its analysis—like ASBC's arguments—focuses entirely on the "any action" clause: "otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with" a fossil fuel company. Tex. Gov't Code § 809.001(1); *see* ROA.730 ("The plain meaning of the phrase 'taking any action that is intended to penalize' fossil fuels includes, for example, speaking about the risks posed by fossil fuels, advocating against reliance on fossil fuels, and associating with like-minded organizations[.]").

The district court erred in three ways in analyzing this clause. First, the district court misinterpreted the clause in light of the canons of *ejusdem generis* and constitutional avoidance. Second, the district court failed to apply the facial-challenge standard required by *Moody v. NetChoice*. Third, even if the "any action" clause posed constitutional issues, the district court should have severed that clause rather than enjoining the statute as a whole.

### 1. The district court misinterpreted the "any action" clause.

The district court's analysis of the "any action" clause disregards its context. According to the district court, "[t]he plain meaning of the phrase 'taking any action that is intended to penalize' fossil fuels includes, for example, speaking about the risks posed by fossil fuels, advocating against reliance on fossil fuels, and associating with like-minded organizations." ROA.730.

The Eighth Circuit considered and rejected an identical argument in *Arkansas Times*: "Arkansas Times argues that the catch-all 'other actions' language includes constitutionally protected activity that is intended to limit commercial relations with Israel." 37 F.4th at 1393. Applying the canons of constitutional avoidance and

*ejusdem generis*, the Eighth Circuit correctly held that the "other actions" phrase relates "solely to commercial activities." *Id.* This Court should do the same.

Like Arkansas, Texas applies the canon of constitutional avoidance. "In analyzing the constitutionality of a statute, we should, if possible, interpret the statute in a manner that avoids constitutional infirmity." *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998) (citing *Barshop v. Medina Cnty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996)). In determining the meaning of "any action that is intended to penalize," this Court should, if possible, interpret the phrase to be limited to commercial activity.

And like Arkansas, Texas applies the *ejusdem generis* canon, which "warns against expansive interpretations of broad language that immediately follows narrow and specific terms, and counsels us to construe the broad in light of the narrow." *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010). "When faced with a list of specific items and a catch-all provision, courts should '[c]onsider the listed elements, as well as the broad term at the end, and ask what category would come into the reasonable person's mind.'" *City of San Antonio v. Realme*, No. 24-0864, 2026 WL 706013, at *5 (Tex. Mar. 13, 2026) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 208 (2012)).

The listed elements in the "boycott definition"—"refusing to deal with" and "terminating business activities with"—plainly concern commercial activities. The phrase "otherwise taking any action" should be construed in light of these specific examples to be limited to commercial activities. And the prohibited actions must be "intended to penalize, inflict economic harm on, or limit commercial relations with"

a fossil fuel company. Tex. Gov't Code § 809.001(1). "Limit commercial relations" with a fossil fuel company concerns commercial activities. Similarly, "inflict economic harm on" is most readily understood to involve commercial activities.

The district court's interpretation of "any action intended to penalize"—to include "speaking about the risks posed by fossil fuels, advocating against reliance on fossil fuels, and associating with like-minded organizations"—stretches this phrase far beyond the rest of the statute and far beyond its natural meaning in context. This approach to "penalize" violates the *noscitur a sociis* canon, which "avoid[s] ascribing to one word a meaning so broad that it is incommensurate with the statutory context." *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 61 (Tex. 2015); *see also id.* ("[T]he meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it."). In context, "otherwise taking any action intended to penalize" does not include "speaking about the risks posed by fossil fuels" but instead refers to penalizing a fossil fuel company in the context of a commercial transaction with that company.

The district court expressed confusion about the "ordinary business purpose" exception: "It is admittedly difficult to imagine what sort of conduct is both not an 'ordinary business purpose' and not an expression protected by the First Amendment[.]" ROA.733.

The district court's reasoning was incorrect—only expressive conduct receives First Amendment protection. The Supreme Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea" and has "extended First Amendment protection only to

conduct that is inherently expressive." *FAIR*, 547 U.S. at 65–66 (internal quotation marks omitted). In *FAIR*, for example, the law schools' conduct of excluding military recruiters from campus was not motivated by an ordinary business purpose, but the conduct was, nonetheless, not expressive. *See id.* at 62 ("The compelled speech to which the law schools point is plainly incidental to the Solomon Amendment's regulation of conduct[.]").

Correctly interpreted, the "any action" clause, like SB13 as a whole, regulates conduct and not speech and does not violate the First Amendment.

**2. The district court failed to conduct the analysis required by *Moody v. NetChoice*.**

In addition, even if the district court were correct that some applications of SB13—such as some applications of the "any action intended to penalize" definition—would be unconstitutional, the district court erred by failing to hold ASBC to its burden under *Moody v. NetChoice, LLC* to demonstrate that a law's unconstitutional applications substantially outweigh its constitutional ones. 603 U.S. 707, 723–24 (2024).

The decision to bring a facial challenge "comes at a cost," *id.* at 723, and the district court was required to "determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other," *id.* at 718.

Although the district court recited the standard that a court must consider a law's "plainly legitimate sweep," ROA.729, ROA.731, it failed to apply the *NetChoice* test. Nothing in the district court's analysis acknowledges any

constitutional applications of the law, much less compares the constitutional applications to the unconstitutional ones. The failure is particularly glaring because, as detailed above, it appears undisputed that SB13 is constitutional in its mine-run applications, including the State's refusal to invest its money with companies that refuse to deal with fossil fuel companies given their importance to the state economy[4].

Even if the district court were correct that SB13 is overbroad in some applications, it did not consider its full range of applications of SB13, evaluate which applications are constitutional, or compare the unconstitutional applications to the constitutional ones. That failure alone warrants vacatur and remand. *See NetChoice*, 603 U.S. at 726 (reversing and remanding for the district court to undergo this analysis in the first instance); *see also Woodlands Pride v. Paxton*, 168 F.4th 293, 307–08 (5th Cir. 2026) (same).

**3. The district court erred by enjoining the statute as a whole and not severing any unconstitutional portion.**

Moreover, even if the "any action intended to penalize" portion of the "boycott" definition were facially unconstitutional as overbroad, the district court should have enjoined only that portion of the statute rather than enjoining SB13 as a whole.

[4] Texas is the top oil-producing State in the nation, contributing approximately 42% of the nation's total crude oil. *Texas Is the Top State for Oil and Gas Production and for Wind-Powered Generation*, Tex. Econ. Dev. Corp. (Feb. 6, 2025), https://businessintexas.com/rankings/texas-is-the-top-state-for-oil-and-gas-production-and-for-wind-powered-generation/.

Although SB13 does not contain an express severability clause, Texas presumes severability:

> Unless expressly provided otherwise, if any provision of a statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application, and to this end the provisions of the statute are severable.

Tex. Gov't Code § 312.013(a); *see also Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 474 (Tex. 1997) (applying this presumption).

For SB13, the "refusing to deal with" and "terminating business activities with" definitions of "boycott" could be given effect without the "any action" clause. Even if the district court were otherwise correct, any injunction should have been limited to the allegedly unconstitutional portion of SB13 and not to the statute as a whole.

* * *

The district court erred by enjoining SB13 as facially unconstitutional for overbreadth.

## III. SB13 Is Not Unconstitutionally Vague.

The district court also erred by holding that SB13 is unconstitutionally vague.

### A. ASBC lacks associational standing to raise a vagueness challenge because its identified members unambiguously fall within the statute.

ASBC lacks associational standing to challenge SB13 as vague. Its two identified members—Etho Capital and Sphere—have engaged in conduct that is clearly proscribed by SB13, and "[a] plaintiff who engages in some conduct that is clearly pro-

scribed cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian Law Project*, 561 U.S. at 20 (quoting *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982); alteration in original).

SB13 defines "boycott energy company" to include "refusing to deal with," and "terminating business activities with" fossil fuel companies. Tex. Gov't Code § 809.001(1). The Etho Fund invests in companies on the Etho Index, which Etho Capital concedes "screens out fossil fuel companies." ROA.371. The Etho Fund does not merely seek to realize profits but aims to achieve the goal of "improving the climate of our planet." ROA.371. "Etho Capital avoids investing in companies that explore and produce fossil fuel-based energy and does not include fossil fuel companies in the Etho Index." ROA.374. The investment decisions of the Etho Fund fall squarely within the heartland of refusing to deal with fossil fuel companies.

The Sphere Fund similarly "does not invest in fossil fuel companies." ROA.377. "Sphere believes that avoiding investment in fossil fuels will result in a more sustainable climate." ROA.378. "Sphere forego[es] investments in fossil fuel companies." ROA.380. Again, the investment methodology of the Sphere Fund falls squarely within boycotting fossil fuel companies as used in SB13.

There is no question that the Etho Fund and Sphere Fund "refus[e] to deal with" fossil fuel companies—Etho Capital and Sphere admit as much. There should be no surprise that the Comptroller listed these funds as prohibited investments for Texas, which wishes to invest in fossil fuel companies.

Etho Capital and Sphere claim they cannot understand how their funds could be removed from the list, ROA.374, ROA.381, but the answer is self-evident: stop

refusing to deal with fossil fuel companies. If Etho Capital wishes Texas to invest in the Etho Fund, then it must stop "screen[ing] out fossil fuel companies." ROA.371. If Sphere wishes Texas to invest in the Sphere Fund, then it must "invest in fossil fuel companies," ROA.377, and cease "forego[ing] investments in fossil fuel companies," ROA.380.

A party whose conduct falls within a statutory prohibition cannot credibly claim it lacks fair notice of "what is prohibited" or that enforcement against it is "arbitrary." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008). Etho and Sphere know precisely why their funds are listed: they openly refuse to invest in fossil-fuel companies. Whatever uncertainty may exist at the statute's outer edges, that uncertainty has nothing to do with Etho Capital and Sphere, and ASBC lacks associational standing to challenge the statute as vague. *Blum v. Holder*, 744 F.3d 790, 799 n.14 (1st Cir. 2014) ("To the extent plaintiffs may intend to engage in clearly proscribed conduct, they lack standing to assert a vagueness claim.").

## B. SB13 is not unconstitutionally vague.

On the merits, SB13 is not unconstitutionally vague.

### 1. SB13 governs how the State spends its own funds; it does not regulate private parties.

The void-for-vagueness doctrine is designed to prevent statutes from "forbid[ding] or requir[ing] the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application" on pain of criminal or civil sanctions. *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961). A plaintiff bringing a vagueness challenge must "establish that the law is

vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *La Union del Pueblo Entero v. Abbott (LUPE)*, 167 F.4th 743, 756 (5th Cir. 2026) (internal quotation marks omitted). "[A] statute can be perfectly constitutional even if it uses imprecise terms." *Id.* (cleaned up). "The law is full of instances where a man's fate depends on his estimating rightly" about "what the law requires of him." *Id.* (cleaned up). "[A] challenger bears the weighty burden of demonstrating that the law is impermissibly vague in all of its applications." *Id.* (internal quotation marks omitted).

The void-for-vagueness doctrine serves two purposes: ensuring fair notice of what conduct will trigger punishment and guarding against arbitrary enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). Both concerns apply to "prohibitions" and their "enforcement," *id.* at 108, and presuppose a coercive regulatory regime in which private parties face legal liability.

Those concerns are substantially diminished when the government acts as "patron rather than as [a] sovereign." *Finley*, 524 U.S. at 589. As the Supreme Court explained, in that context "the consequences of imprecision are not constitutionally severe." *Id.* The government is permitted to apply a "subjective selection process" when determining what to fund, *id.* at 590, and should be even less constrained when managing its own investment portfolio or determining what to purchase. To hold

otherwise would "call into question the constitutionality of . . . valuable [g]overnment programs." *Id.* at 589.[5]

This Court applied the same principle in *Machete Productions, L.L.C. v. Page*, which examined Texas's film-incentive program. 809 F.3d 281 (5th Cir. 2015).[6] Among other statutory requirements, applications could be denied "because of inappropriate content or content that portrays Texas or Texans in a negative fashion," based on "general standards of decency," or because they did not show "respect for the diverse beliefs and values of the citizens of Texas." *Id.* at 285 (quoting Tex. Gov't Code § 485.022(e)). This Court rejected a vagueness challenge to these criteria because the State was "acting as a patron rather than as sovereign." *Id.* at 291 (quoting *Finley*, 524 U.S. at 588–89).

The Fourth Circuit reached the same conclusion in *National Association of Diversity Officers in Higher Education (NADOHE) v. Trump*, 167 F.4th 86 (4th Cir. 2026), rejecting a facial vagueness challenge to an executive order directing agencies to terminate all "equity-related grants or contracts," even though the order never defined "equity-related." *Id.* at 101–02. Applying *Finley*, the Fourth Circuit recognized that there is "greater latitude for vagueness in funding decisions." *Id.* at 102. Critically, the challenged provision "doesn't ask anything of [the plaintiffs], nor does

[5] Unlike in *Finley*, the State is not funding private speech but instead purchasing goods and services for its own use. In these circumstances, the State can express its own viewpoint. *E.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009).

[6] Although *Machete Productions* resolved these issues in the context of qualified immunity, holding that the plaintiff's clearly established rights were not violated, its analysis provides helpful guidance. 809 F.3d at 289.

it regulate private conduct." *Id.* at 101. "Instead, it instructs the President's subordinates to act." *Id.* It was a "policy directive from the President to his agents." *Id.* The Fourth Circuit recognized that it was "reviewing the President's directive to his subordinates about how they should allocate federal funding based on the President's priorities." *Id.* at 102. In these circumstances, as in *Finley*, there are minimal concerns about vagueness.

SB13 operates the same way as the provisions at issue in *Finley*, *Machete Productions*, and *NADOHE*: It regulates only how the State will spend its money. There are no civil or criminal punishments for boycotting fossil fuel companies as defined in SB13. The only consequence is that the State will not choose to participate in the boycott with its funding. Even if there were "substantial vagueness concerns" if the text of SB13 "appeared in a criminal statute or regulatory scheme," there are no similar concerns because it regulates the State's funding. *Finley*, 524 U.S. at 588.

**2. The district court erred in analyzing vagueness.**

The district court's analysis of vagueness errs in several respects. First, the district court erroneously characterized SB13 as "prohibit[ing]" conduct by private parties. ROA.731. As discussed above, the only prohibitions in SB13 apply to state entities. The district court overlooked the crucial difference in analyzing vagueness between regulatory schemes and regulations of government spending decisions. *Finley*, 524 U.S. at 588.

Second, the district court suggested that "the expansive phrase 'taking any action' is unlimited and vague." ROA.732. As detailed above, the district court failed to apply the canons of statutory construction, including constitutional avoidance,

*ejusdem generis*, and *noscitur a sociis*. Read in context, the "any action" clause applies to commercial transactions, just like the rest of the statute. *See LUPE*, 167 F.4th at 757–59 (reversing district court's permanent injunction of state law in part due to the erroneous statutory interpretation in the context of a facial vagueness challenge).

Much of the district court's vagueness analysis truly concerns overbreadth. According to the district court, "'[a]ny action that is intended to penalize' could mean anything from inflicting direct economic harm on an energy company, to participating in the 2019 Global Climate Strike or publicly advocating for climate-positive laws." ROA.732 (internal citations omitted). As discussed above, the district court's interpretation is wrong, but even under the district court's interpretation, SB13 would be broad, not vague. *See also* ROA.732 ("'[L]imit[ing] commercial relations' is additionally vague because it could mean merely ceasing ongoing business or it could also include refraining from new business, reducing the amount of business, or other decisions."). The district court's vagueness analysis truly reflects concerns about breadth, not vagueness. *See Holder*, 561 U.S. at 20 (cautioning courts not to confuse vagueness with overbreadth).

Third, the district court erroneously found SB13's "ordinary business purpose" exception "particularly puzzling," pointing to the Comptroller's treatment of companies' questionnaire responses as evidence that the exception provides no meaningful guidance and noting a statement in which the Comptroller suggested that companies could be removed from the covered-companies list by resigning their memberships in organizations advocating for sustainable investing. ROA.732–33.

The phrase "ordinary business purpose" is a well-established commercial standard. Versions of that phrase appear in dozens of statutes and have been interpreted for well over a century. *See, e.g.*, U.C.C. § 1-201(b)(9) (defining "buyer in ordinary course of business"); 11 U.S.C. § 363(b)(1) (authorizing trustee to "use, sell, or lease" property "in the ordinary course of business"). Any financial company would readily understand that investment decisions grounded in standard financial criteria fall comfortably within the exception, while decisions driven by ideological opposition to the fossil-fuel industry do not.

Read as a whole, SB13 targets financial companies that, for non-commercial reasons, refuse to deal with fossil-fuel companies. The "ordinary business purpose" qualifier, the fiduciary overrides, and the commercial context the district court ignored all work together to cabin the statute's reach: a firm that declines to invest in a fossil fuel company for neutral risk-adjusted return, diversification, or other standard financial reasons is, by definition, outside the statute, and even listed firms' securities may remain in state portfolios when divestment would harm beneficiaries. Tex. Gov't Code §§ 809.001(1), .005, .056; *see King v. Burwell*, 576 U.S. 473, 492 (2015) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme[.]" (citation omitted)).

Etho Capital's and Sphere's ideological opposition to fossil fuels does not constitute an "ordinary business purpose" for boycotting fossil fuel companies. *See* ROA.373 ("We advocate against reliance on fossil fuels or investment in fossil fuel companies[.]"); ROA.380 ("Sphere intends to maintain the investment methodology of the Sphere Fund, and to continue making public statements expressing its

views on fossil fuels, climate change, and climate risk."). The district court's suggestion that the Comptroller was required to blindly accept the companies' assertions that they acted for an "ordinary business purpose"—contrary to the companies' own admissions that their funds refuse to invest in fossil fuel companies, no matter how profitable such an investment might be—has no basis in the statute's text. *See* ROA.732–33.

Nor was the district court correct to consider the Comptroller's enforcement choices and public statements in holding SB13 facially invalid. The Fourth Circuit explained in *NADOHE* that relying on "enforcement evidence" impermissibly "blur[s] the line between a facial and as-applied challenge." 167 F.4th at 102. When disputes arise over a statute's application to particular facts, "an as-applied challenge is available," but plaintiffs who forgo as-applied challenges and seek only facial invalidation cannot use the specter of difficult applications to defeat the statute wholesale. *See Iowa Safe Schs. v. Reynolds*, 172 F.4th 589, 597 (8th Cir. 2026) ("Condemned to the use of words, we can never expect mathematical certainty from our language." (citation omitted)); *see also City of Chicago v. Morales*, 527 U.S. 41, 111 (1999) (Thomas, J., dissenting) (explaining that "[i]nstances of arbitrary or discriminatory enforcement" should not be addressed "prophylactically through the disfavored mechanism of a facial challenge on vagueness grounds"). An executive officer's alleged misapplication of a clear statute does not render the statute facially vague; it supplies the basis for an as-applied challenge by an aggrieved party.

* * *

SB13 provides all the guidance the Due Process Clause requires of a civil statute governing state investment decisions. A statute that tells state investment managers which securities to avoid and state procurement officers what to verify from vendors before signing large contracts does not require the precision of a criminal statute. It needs enough clarity to guide those managers and officers in their proprietary functions. SB13 supplies that.

## IV. The District Court Erred by Entering a Universal Injunction.

The district court declared "that SB13 is unconstitutional under the First and Fourteenth Amendments of the United States Constitution" and ordered, "that Defendants are enjoined from implementing or enforcing SB13." ROA.733–34. That order bars enforcement of SB13 against anyone, not just ASBC's membership. It operates as a universal permanent injunction, forbidding the State from applying the statute to hundreds of financial companies subject to Chapter 809 and to thousands of vendors subject to Chapter 2276 that are not parties to this lawsuit. Before the district court, ASBC did not raise any arguments about its entitlement to injunctive relief or the proper scope of any injunction. *See* ROA.338–62; ROA.685–711.

The Supreme Court held last year—months after the parties completed their summary judgment briefing[7]—that universal injunctions "fal[l] outside the bounds of a federal court's equitable authority under the Judiciary Act." *CASA*, 606 U.S. at 847. The Judiciary Act of 1789 endowed federal courts with jurisdiction over "all suits . . . in equity," and the Supreme Court has consistently held that the statutory

[7] ASBC filed its reply in support of its motion for partial summary judgment in April 2025. ROA.9. The Supreme Court decided *CASA* on June 27, 2025.

grant encompasses only those remedies "traditionally accorded by courts of equity" at the Nation's inception. *Id.* at 841 (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). The proper remedy is an injunction that "will offer complete relief *to the plaintiffs before the court*." *Id.* at 852.

The universal injunction entered by the district court extends beyond the parties before the court. Even if some injunction were appropriate, this Court should vacate the injunction and remand for entry of an injunction no broader than necessary to provide "complete relief to the plaintiffs before the court." *Id.*

## Conclusion and Prayer

For these reasons, this Court should vacate the partial summary judgment in favor of ASBC. With respect to the vagueness challenge to the Divestment Provision (Claim Two) and claims regarding the Procurement Provision (Claims Three and Four), this Court should render judgment dismissing the claims for lack of jurisdiction. With respect to the First Amendment challenge to the Divestment Provision (Claim One), this Court should render judgment in favor of the State.

Respectfully submitted.

/s/ William R. Peterson

| | |
|---|---|
| Ken Paxton<br>Attorney General of Texas | William R. Peterson<br>Solicitor General |
| Brent Webster<br>First Assistant Attorney General | Cameron Fraser<br>Assistant Solicitor General |

*Counsel for Defendants-Appellants*

## Certificate of Service

On May 4, 2026, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ William R. Peterson
William R. Peterson

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,663 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William R. Peterson
William R. Peterson