**No. 26-50111**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

AMERICAN SUSTAINABLE BUSINESS COUNCIL,
*Plaintiff-Appellee*,

v.

KELLY HANCOCK, in his official capacity as Acting Texas Comptroller of Public Accounts; KEN PAXTON, Attorney General, State of Texas,
*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Western District of Texas, No. 1:24-cv-01010, Hon. Alan D. Albright

# BRIEF OF PLAINTIFF-APPELLEE

Rachel L. Fried Nguemaha
Joshua M. Salzman
Victoria S. Nugent
Brian D. Netter
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 340-5828
rnguemaha@democracyforward.org
*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF INTERESTED PARTIES

**No. 26-50111, *American Sustainable Business Council v. Hancock***

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

American Sustainable Business Council

American Sustainable Business Institute

American Sustainable Business Network

Brinckerhoff, Matthew D.

Burra, Ananda

Democracy Forward Foundation

Emery Celli Brinckerhoff Abady Ward & Maazel LLP

Etho Capital LLC

Farrell, William Howard

Fraser, Cameron

Guerrero, Marco Kelly

Guerrero & Whittle PLLC

Hancock, Kelly

Hegar, Glenn

Kharod, Ketan Upendra

Mayat, Sana F.

Miller, Kristen Paige

Netter, Brian D.

Nguemaha, Rachel L. Fried

Nugent, Victoria S.

Our Sphere, Inc.

Paxton, Ken

Perryman, Skye L.

Peterson, William R.

Salzman, Joshua Marc

Talla, Vasudha

Whittle, Mary Melissa

/s/ *Rachel Lauren Fried Nguemaha*

*Council for Plaintiff-Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Without endorsing the reasons presented by Defendants, ASBC agrees that oral argument may be of assistance to the Court.

## TABLE OF CONTENTS

Introduction ..... 1
Jurisdictional Statement ..... 2
Issues Presented ..... 2
Statement of the Case ..... 3
A. Senate Bill 13 ..... 3
B. Defendants Interpret and Implement SB13 ..... 6
C. Plaintiff ASBC's Members Are Blacklisted ..... 8
D. Proceedings Below ..... 10
Summary of the Argument ..... 13
Standard of Review ..... 15
Argument ..... 16
I. SB13 Violates the First Amendment. ..... 16
A. SB13 is Overbroad and Viewpoint-Discriminatory. ..... 16
1. SB13 is facially overbroad. ..... 17
2. SB13 unconstitutionally discriminates based on viewpoint. ..... 20
3. The record confirms Defendants exploited SB13 to penalize companies they perceive to espouse an anti-fossil fuel viewpoint. ..... 23
B. Defendants' Efforts to Undermine the District Court's Reasoning Fail. ..... 25
1. The district court correctly applied the test for overbreadth. ..... 26
2. No canon or principle of statutory construction overrides the ordinary meaning of SB13. ..... 28
3. Defendants' cases are inapposite. ..... 33
4. Defendants' market participant theory is wrong. ..... 36
C. The "Taking Any Action" Clause Is Not Severable. ..... 38
II. SB13 Is Also Unconstitutionally Vague. ..... 39
A. SB13 Lacks Discernable Standards, Which Has Predictably Resulted in Arbitrary Enforcement. ..... 40
B. ASBC Has Standing to Challenge SB13's Vagueness. ..... 45

III. ASBC Has Standing to Challenge the Procurement Provision........................47
IV. Defendants Fail to Show Entitlement to a Narrower Injunction. ....................48
Conclusion ........................................................................................................50

# TABLE OF AUTHORITIES

## Cases

*A & R Eng'g & Testing, Inc. v. City of Hou.*, 582 F. Supp. 3d 415 (S.D. Tex. 2022)....22, 32

*A & R Eng'g & Testing, Inc. v. Scott*, 72 F.4th 685 (5th Cir. 2023)....22

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)....36, 37

*Ali v. Fed. Bur. of Prisons*, 552 U.S. 214 (2008) ....13, 29, 30, 32

*Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020)....22

*Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717 (W.D. Tex. 2019) ....22, 31, 33

*Ark. Times LP v. Waldrip as Tr. of Univ. of Ark. Bd. of Trs.*, 37 F.4th 1386 (8th Cir. 2022)....34, 35

*Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014)....49

*Bouchikhi v. Holder*, 676 F.3d 173 (5th Cir. 2012)....17, 29

*Builder Recovery Servs. LLC v. Town of Westlake*, No. 02-20-00051-CV, 2023 WL 3878446 (Tex. App. June 8, 2023) ....39

*City of San Antonio v. Realme*, 731 S.W.3d 342 (Tex. 2026) ....29

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) ....33

*Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747 (5th Cir. 2010) ....11, 15, 48

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)....43, 47

*Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992)....45

*Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1 (2023)....49

*Hill v. City of Houston, Tex.*, 764 F.2d 1156 (5th Cir. 1985), *on reh'g*, 789 F.2d 1103 (5th Cir. 1986), *aff'd*, 482 U.S. 451 (1987) ....18

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ........................................43

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ........................................20, 23

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) ........................................20, 36

*Magee v. City of S. Padre Island,* 463 F. App'x 377 (5th Cir. 2012) ........................................45

*Med-Cert Home Care, L.L.C. v. Becerra*, 19 F.4th 828 (5th Cir. 2021) ........................................16

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ........................................17, 26, 27, 28

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ........................................21

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ........................................19

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86 (4th Cir. 2026) ........................................43

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ........................................43

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ........................................33

*New Jersey v. Trump*, 131 F.4th 27 (1st Cir. 2025) ........................................49

*Oakes Farms Food & Distrib. Servs., LLC v. Adkins*, 154 F.4th 1338 (11th Cir. 2025) ........................................36

*Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847 (5th Cir. 2003) ........................................15, 16

*Perry v. Sindermann*, 408 U.S. 593 (1972) ........................................36

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ........................................14, 20

*Rollins v. Home Depot USA*, 8 F.4th 393 (5th Cir. 2021) ........................................26, 48

*Rose v. Drs. Hosp.*, 801 S.W.2d 841 (Tex. 1990) ........................................39

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ........................................14, 20

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47 (2006) ........................................33

*Secretary of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ........................... 48

*Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016) .................................. 17, 26, 33

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) ...................... 43

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ....................................................... 49, 50

*United States v. Alpers*, 338 U.S. 680 (1950) ........................................................ 29

*United States v. Buluc*, 930 F.3d 383 (5th Cir. 2019) ........................................ 13, 30

*United States v. Hansen*, 599 U.S. 762 (2023) ...................................................... 28

*United States v. Stevens*, 559 U.S. 460 (2010) .......................... 11, 13, 17, 19, 26, 33

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) .......... 28

*Welty v. Dunaway*, 791 F. Supp. 3d 818 (M.D. Tenn. 2025) ................................... 50

*Woodlands Pride v. Paxton*, 168 F.4th 293 (5th Cir. 2026) .............................. 26, 28

*Yates v. United States*, 574 U.S. 528 (2015) ......................................................... 32

**Statutes, Rules, and Regulations**

28 U.S.C. § 1292 ........................................................................................ 2

28 U.S.C. § 1331 ........................................................................................ 2

34 Tex. Admin. Code § 20.585 .................................................................. 44

Ark. Code Ann. § 25-1-502 ........................................................................ 34

Fed. R. Civ. P. 56 ....................................................................................... 16

Tex. Gov't Code § 2251.001 .......................................................................... 5

Tex. Gov't Code § 2276.001 .............................................................. 4, 5, 17

Tex. Gov't Code § 2276.002 ..................................................................... 3, 4

Tex. Gov't Code § 312.013 .......... 39

Tex. Gov't Code § 809.001 .......... 1, 4, 12, 13, 14, 17, 29, 34, 38, 40, 45

Tex. Gov't Code § 809.005 .......... 22

Tex. Gov't Code § 809.051 .......... 4, 5, 38, 43

Tex. Gov't Code § 809.053 .......... 3, 4, 5

Tex. Gov't Code § 809.056 .......... 22

Tex. Gov't Code § 809.057 .......... 4

Tex. Gov't Code § 809.102 .......... 4

**Other Authorities**

*Action*, Merriam-Webster, https://tinyurl.com/5b6cayvh (captured June 17, 2026) .......... 18

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......... 30, 31

*Any*, Merriam-Webster, https://tinyurl.com/53e8bwzh (captured July 1, 2026) .......... 18, 35

Comptroller.Texas.Gov, Divestment Statues Lists, https://perma.cc/SFE2-NE8Q (captured June 29, 2026) .......... 6

*Expression*, Merriam-Webster, https://tinyurl.com/588vx58p (captured July 1, 2026) .......... 18

Liz Crampton, *The State Comptroller Needling BlackRock*, Politico (Oct. 12, 2022), https://perma.cc/9NZ6-YLTN .......... 7, 21, 23

*Penalize*, Merriam-Webster, https://tinyurl.com/3dtx4m5n (captured July 1, 2026) .......... 35

*Penalty*, Merriam-Webster, https://tinyurl.com/wx2hvrnb (captured July 1, 2026) .......... 35

S.B. 13 Bill Analysis, Committee Report (Unamended),
https://perma.cc/S39P-FFML (captured April 27, 2026) .......................3, 4, 16

## INTRODUCTION

In 2021, Texas adopted Senate Bill 13 (SB13), a statute that largely prevents companies that "boycott" the fossil fuel industry from receiving state investments or serving as state contractors. Because SB13 defines boycotting activity expansively to reach "any action that is intended to penalize" a company in the fossil fuel industry, Tex. Gov't Code § 809.001(1), the statute is triggered by core protected expression. Indeed, because the statute has an exemption for actions taken for an "ordinary business purpose," it carries consequences only for the expressive components of actions the State deems are "intended to penalize" fossil fuels. The Texas Comptroller, who is charged under SB13 with maintaining a blacklist of companies that are identified as boycotters, has understood SB13's boycotting definition to sanction purely expressive content. Even a company that actively invests in the oil and gas sector can find itself blacklisted if it has engaged in "anti-oil and gas rhetoric." ROA.516.

Because SB13 impinges on core protected speech and invites arbitrary application, the district court properly enjoined it on both First Amendment and due process grounds. In challenging that decision, Defendants make little effort to defend SB13 as written or as it has actually been applied in the several years since its enactment. Instead, they reimagine SB13 as reflecting a judgment by the Texas legislature that "fossil fuel companies are good investments and good contracting partners." Defs. Br., Dkt. 50, at 3. But while Texas unquestionably has the power to

invest in or contract with fossil fuel companies, SB13 imposes no such requirements. It does not include any affirmative mandate to invest in fossil fuel companies; it merely renders financial companies ineligible for receiving investments if they express concerns about long-term risks in the industry or if they pledge to lower carbon emissions in their own corporate operations, even if they nonetheless choose to invest in fossil fuels. Likewise, contractors who provide goods or services completely unrelated to fossil fuels—from IT systems to building supplies to cafeteria food—are required to certify that they do not boycott fossil fuel companies, even when the contractor's stance on fossil fuels is wholly unrelated to the services it would provide.

SB13 is fatally overbroad and irretrievably vague. The district court was correct to facially enjoin its enforcement.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On February 3, 2026, the district court entered partial summary judgment and a permanent injunction. ROA.733-34. Defendants timely noticed an appeal on February 6, 2026. ROA.735. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1. Whether SB13 violates the First Amendment because its definition of "boycott energy companies" is overbroad and discriminates based on viewpoint.

2. Whether SB13 is unconstitutionally vague in violation of the Due Process Clause because its definition of "boycott energy companies" (1) fails to provide a reasonable opportunity to know what conduct is prohibited "boycotting," and (2) invites—and has led to—discriminatory and arbitrary enforcement.

3. Whether the district court correctly permitted ASBC to bring a First Amendment overbreadth challenge against SB13's provision generally prohibiting state contracts with companies that "boycott energy companies."

4. Whether the scope of the district court's injunction is appropriate, where the district court concluded SB13 is unconstitutional in several respects and where Defendants raised their argument concerning scope for the first time on appeal.

## STATEMENT OF THE CASE

### A. Senate Bill 13

In 2021, Texas adopted Senate Bill 13 ("SB13") to deny state funds to companies that "promote an agenda that hurts the state's energy sector." S.B. 13 Bill Analysis, Committee Report (Unamended), https://perma.cc/S39P-FFML (captured April 27, 2026). To that end, SB13 directs state entities to divest from and refrain from contracting with companies that "boycott energy companies." Tex. Gov't Code §§ 809.053(d), 2276.002(b). For these purposes, "energy companies" are limited to companies engaged in fossil fuel extraction, refining, selling, and other related activities; the term does not include Texas's solar, wind, hydroelectric, geothermal,

or other renewable energy industries. *See id.* Nor does SB13 distinguish in any way between energy companies based in Texas and foreign energy companies. *See id.*

SB13 expansively defines the phrase "boycott energy company" to reach "refusing to deal with," "terminating business activities with," or "otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with" a company engaged in the fossil fuel industry. *Id.* § 809.001(1). However, the statute exempts actions that would otherwise fall within the scope of this prohibition if taken for "an ordinary business purpose." *Id.*

SB13 implements the objective to penalize companies that "promote" an anti-fossil fuel agenda, *see supra* S.B. 13 Bill Analysis, through two key provisions: Section 1 (the "Divestment Provision"), codified at Tex. Gov't Code §§ 809.001-102, and Section 2 (the "Procurement Provision"), codified at Tex. Gov't Code §§ 2276.001-002. The Divestment Provision prohibits the state retirement systems and the permanent school fund from investing in—and requires them to divest from—financial companies that "boycott energy companies." *Id.* §§ 809.053(d), 809.057.[1] The Comptroller is directed to make a blacklist of financial companies that "boycott energy companies" under the law's definition. *Id.* § 809.051(a). In

[1] The Divestment Provision applies to: (A) the Employees Retirement System of Texas; (B) the Teacher Retirement System of Texas; (C) the Texas Municipal Retirement System; (D) the Texas County and District Retirement System; (E) the Texas Emergency Services Retirement System; and (F) the permanent school fund. *Id.* § 809.001(7).

compiling that list, the Comptroller may "rely . . . on publicly available information" (including from "nonprofit[s]" and "research firms") and may "request written verification" from financial companies that they do not boycott energy companies. *Id.* If a company provides a "written response" to the request, the Comptroller "may"—but is not required to—"rely, as appropriate" on the response in deciding whether the company is boycotting. *Id*. A financial company that fails to provide such verification within 60 days "is presumed to be boycotting energy companies." *Id.* § 809.051(b). Once the blacklist is compiled, the Comptroller must provide it to the state governmental entities subject to the Divestment Provision. *Id.* § 809.051(a). Those entities generally must then divest from any listed companies that do not "cease boycotting" after a 90-day warning. *Id.* § 809.053(b).

The Procurement Provision prohibits governmental entities—defined as all state agencies and political subdivisions of the state, *id.* § 2276.001(3) (adopting the definition of "Governmental entity" at Tex. Gov't Code § 2251.001), including local governments—from "contract[ing] with a company for goods or services unless the contract contains a written verification from the company" that it does not "boycott energy companies" and will not do so "during the term of the contract," *id.* § 2276.002(b). This provision adopts the Divestment Provision's definition of "Boycott energy company." *Id.* § 2276.001.

### B. Defendants Interpret and Implement SB13

Defendants have implemented SB13 and made numerous public statements explaining the criteria they used to determine which companies are fossil fuel "boycotters." In developing the blacklist, the Comptroller sent questionnaires in 2022 and again in 2023 to numerous financial companies asking for written verification that the companies do not "boycott energy companies" and posing other questions about those companies' business practices. The Comptroller received responses from many of these companies. *See* ROA.388-479. The Comptroller has compiled and published five iterations of the blacklist in August 2022, March 2023, November 2023, August 2024, and June 2025.[2] ROA.480-514.

Several companies, including Credit Suisse, State Street Global Advisors, and BNY Mellon stated in response to the Comptroller's questionnaires that they consider climate risk relevant to overall financial risk and performance, but that they do so only for an "ordinary business" purpose and do not "boycott" fossil fuels as defined by SB13. *See* ROA.430-32, 435, 438, 440, 445-49. Likewise, BlackRock explained that it does not "boycott" fossil fuels under SB13 because it held $115 billion in Texas energy companies and, in any case, the "ordinary business purpose"

[2] The June 2025 blacklist was published after summary judgment briefing in the district court completed. The June 2025 blacklist is available on the Comptroller's website (Comptroller.Texas.Gov, Divestment Statues Lists, https://perma.cc/SFE2-NE8Q (captured June 29, 2026)). BlackRock is no longer listed in Annex 1 of the June 2025 blacklist, although several of its funds are listed on Annex 2.

exclusion in the definition of "boycott" applied to any decision not to invest in any particular company. ROA.391, 398-400; *see also* ROA.404-05, 419-21. Despite these companies' explanations, the Comptroller blacklisted them or several of their funds. *See* ROA.482, 483-84, 487, 491, 492-93, 496, 500, 501-02, 505, 509, 510-11, 513.

When announcing the first iteration of the blacklist in August 2022, the Comptroller stated that the list "shine[s] a light on entities" that, among other things, "engage in anti-oil and gas rhetoric publicly." ROA.516. In November 2022, the Comptroller denied that the goal of blacklisting companies was to persuade them to change their investment portfolios. ROA.354 (citing Liz Crampton, *The State Comptroller Needling BlackRock*, Politico (Oct. 12, 2022), https://perma.cc/9NZ6-YLTN [*hereinafter* Crampton Article]. Rather, the goal was to penalize companies that "privately" invested in oil and gas but whose "publications make it seem as though" they were boycotting oil and gas, referring to such statements as "dishonest." *Id.*; Crampton Article. In a May 2023 publication, the office of the Comptroller explained that BlackRock—although "invested in Texas' public energy companies"—"still has made 'net-zero' public pledges and employs adversarial rhetoric regarding the fossil fuels sector, among other actions that satisfy the boycotting criteria." ROA.617. The Comptroller also instructed that blacklisted companies that ended their associations with certain climate-focused initiatives "would no longer meet the initial criteria for listing." ROA.542. And in March 2023,

the Comptroller repeated his position that "[a] financial company may have investments in the Texas oil and gas industry and still be 'boycotting' under the law." ROA.550.

In the district court, Defendants did not dispute that the blacklist targets companies that "engage in anti-oil and gas rhetoric publicly," or that BlackRock was targeted at least in part because of its "'net-zero' public pledges" and "adversarial rhetoric regarding the fossil fuels sector." *See* ROA.692.[3]

**C. Plaintiff ASBC's Members Are Blacklisted**

The American Sustainable Business Council is a membership organization of companies, investors, and business organizations that represents, collectively, more than 200,000 businesses. ROA.366. ASBC advances sustainable business practices, advocates for policies that support sustainable manufacturing, products, and services, and seeks to amplify the voice of businesses at the national and state levels. ROA.367. Etho Capital LLC (Etho Capital) and Our Sphere, Inc. (Sphere) are members of ASBC. ROA.368. Etho Capital and Sphere are both companies that create investment products. ROA.369, 376.

In 2015, Etho Capital launched the Amplify Etho Climate Leadership U.S. ETF (originally known as the Etho Climate Leadership U.S. ETF), as the first broadly diversified, fossil fuel-free, and ESG-screened U.S. exchange-traded fund

[3] Defendants had the opportunity to file a brief in reply to Plaintiffs' brief listing the facts that Defendants had not disputed, but they opted not to.

on the New York Stock Exchange (the "Etho Fund"). ROA.370. Etho Capital believes its investment methodology identifies better run, more efficient companies that outperform their competitors, which both enhances the financial performance of the Etho Fund and results in a positive impact on the climate. ROA.371. Although the methodology behind the Etho Fund screens out fossil fuel companies, it does not screen out energy companies generally. *Id.* The Etho Fund holds stock in Texas Instruments, a Dallas-based company that manufactures semiconductors used in clean energy infrastructure. *Id.*

Sphere created the Sphere 500 Climate Fund (the "Sphere Fund") to meet a market demand for a climate-friendly 401(k) investment fund option. ROA.377. Sphere also designed its fund to practice sound investment strategy, as investing in fossil fuels carries financial and market risks. *Id.*

In addition to their business purposes for designing fossil-fuel free funds, both Etho Capital and Sphere advocate against reliance on fossil fuels. Their representatives speak publicly against reliance on fossil fuels and their websites reflect their sustainability and pro-environmental positions. ROA.373, 378-40. Etho Capital and Sphere are both also members of several associations dedicated to furthering climate goals. ROA.372, 379.

The Comptroller blacklisted the Etho Capital and Sphere Funds. ROA.484, 487, 493, 496, 502, 505, 511, 514. The Comptroller did so even though Etho Capital

and Sphere each have multiple ordinary business purposes for designing the investment methodology of their funds to screen out fossil fuel companies.

**D. Proceedings Below**

ASBC filed suit in 2024, challenging the constitutionality of SB13. ROA.236-40. Because SB13 took effect in 2021, ASBC did not need discovery to determine how the State interpreted and applied the statute. The blacklists, FAQ sheets explaining how the blacklist was compiled, press releases, memoranda, news articles, and companies' responses to the Comptroller's questionnaires were available publicly or through Public Information Act requests. The parties agreed that no discovery was necessary but reserved their right to seek discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure if they determined discovery was necessary to obtain facts to support an opposition to a motion for summary judgment. ROA.289. No party sought such discovery in the district court.

ASBC moved for partial summary judgment on its First Amendment claims and on its claim that the Divestment Provision violates the Due Process Clause because it is unconstitutionally vague. ROA.726. ASBC sought a permanent injunction against enforcement of SB13. *Id.* Defendants filed a cross-motion for summary judgment on all of ASBC's claims. ROA.664.

The district court granted ASBC's motion for partial summary judgment on February 4, 2026. ROA.723. The Court first held that ASBC had standing derived from its members' injuries from being blacklisted under SB13. ROA.727-28. The

Court further permitted ASBC to bring a facial First Amendment challenge against the Procurement Provision "'to prevent the statute from chilling the First Amendment rights of other parties not before the court.'" ROA.728 (quoting *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir. 2010)).

With respect to the merits, the district court held that SB13 is facially overbroad. The court rejected Defendants' assertion that the statute reaches only commercial conduct unprotected by the First Amendment, observing that "SB13's definition of 'boycott energy companies' permits the State to penalize companies for all manner of protected expression concerning fossil fuels." ROA.729. Applying the standard for overbreadth claims, the district court concluded that "SB13's application to protected speech is 'substantial,' both in absolute terms and 'in relation to the statute's plainly legitimate sweep.'" ROA.730-31 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

The district court also held that SB13 is unconstitutionally vague "because it fails to provide persons of ordinary intelligence a reasonable opportunity to know what conduct is prohibited and does not provide explicit standards for determining compliance with the law." ROA.733. The court independently analyzed each of SB13's three clauses—(1) "refusing to deal with [fossil fuel energy companies]," (2) "terminating business activities with [fossil fuel energy companies]," and (3) "or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with [fossil fuel energy companies]"—and concluded

all of them are "undefined and not susceptible to objective measurement or determination." ROA.731-32 (quoting Tex. Gov't Code § 809.001(1)). For example, "'[A]ny action that is intended to penalize' could mean anything from inflicting direct economic harm on an energy company, to participating in the 2019 Global Climate Strike, . . . or publicly advocating for climate-positive laws." ROA.732 (citations omitted).

The court observed that the statute's "ordinary business purpose" exclusion only exacerbated its vagueness problem: "Although SB 13 excludes actions taken pursuant to 'an ordinary business purpose' from its 'boycotting' definition, the Comptroller has blacklisted companies that asserted their actions were driven by one or more ordinary business purposes." ROA.732. The court cited several record examples of the Comptroller's "discriminatory and arbitrary implementation of SB13," which "demonstrate[d] its vagueness." ROA.733.

The district court declared SB13 unconstitutional under the First and Fourteenth Amendments and issued a permanent injunction prohibiting Defendants from implementing or enforcing the law. ROA.733-34. Defendants unsuccessfully moved the district court for a stay of the injunction. ROA.741; Add. 1 (Dkt. 43 at 35). Defendants then moved for a stay in this Court, which summarily granted the stay without further explanation. Dkt. 76-1 (*per curiam*).

## SUMMARY OF THE ARGUMENT

SB13—which generally prohibits state entities from investing in or contracting with companies that "boycott" fossil fuels—violates the First Amendment. The statute's broad definition of "boycotting" includes taking "any action that is intended to penalize" the fossil fuel industry. *See* Tex. Gov't Code § 809.001(1). The district court correctly applied the standard for First Amendment overbreadth, determining that "SB 13's application to protected speech is 'substantial,' both in absolute terms and 'in relation to the statute's plainly legitimate sweep.'" ROA.731 (quoting *Stevens*, 559 U.S. at 473).

The district court was moreover correct to interpret SB13 according to its "plain meaning," which "permits the State to penalize companies for all manner of protected expression concerning fossil fuels." ROA.720-30. Defendants' efforts to override the plain meaning and confine SB13's application to purely commercial conduct are fruitless. SB13 "lacks the basic premise for applying *ejusdem generis*—a list of specific terms followed by a catchall generic term or terms." *United States v. Buluc*, 930 F.3d 383, 389 (5th Cir. 2019). Rather, SB13's "boycott" definition consists of three disjunctive phrases, to which *ejusdem generis* does not apply. *Ali v. Fed. Bur. of Prisons*, 552 U.S. 214, 225 (2008).

SB13 moreover discriminates based on viewpoint, penalizing companies that engage only in expression Defendants consider "adversarial" to fossil fuels. ROA.617. Laws that discriminate based on viewpoint are "presumed to be

unconstitutional," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995), permissible only where "the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Defendants do not come close to satisfying this exacting standard. SB13 counteracts Defendants' purported interest in furthering the State's economic interest in investing in fossil fuel companies. While SB13 does not encourage investment of state funds in fossil fuel companies in any way, it does permit Defendants to penalize companies that are heavily invested in fossil fuel companies in Texas.

SB13 is also unconstitutionally vague. Its exceedingly broad definition of "boycotting" captures "refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations" with a fossil fuel company. Tex. Gov't Code § 809.001(1). The statute excludes actions taken pursuant to an "ordinary business purpose," but this only compounds the definition's ambiguity. As the district court recognized, this provision produces a "puzzling" result because it is "difficult to imagine what sort of conduct is both not an 'ordinary business purpose' and not an expression protected by the First Amendment." ROA.732-33.

The unconstitutional applications of SB13 are borne out by the record. Defendants have announced that SB13 punishes companies that "engage in anti-oil and gas rhetoric." ROA.516. They have blacklisted major investment banks with

large oil and gas portfolios on account of "adversarial rhetoric regarding the fossil fuels sector," ROA.617, while ignoring without explanation the companies' ordinary business purposes for restricting the investments of some of their funds or other business decisions including membership in certain climate-focused associations. Etho Capital and Sphere, ASBC's members, remain blacklisted despite having provided reasons for designing funds that restrict investment in fossil fuels, ROA.370-71, 373-74, 377-78, 380-81—reasons that fit comfortably within Defendants' own description of ordinary business purposes, *see* Defs. Br. 36.

ASBC's standing to bring an overbreadth challenge to SB13 encompasses the Procurement Provision, which relies on the same "boycotting" definition as the Divestment Provision. Supreme Court precedent permits courts to relax prudential standing limitations "to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir. 2010) (quotation marks omitted).

Finally, Defendants' claim that the district court erred by providing relief to non-parties is forfeited. Moreover, an injunction limited to ASBC and its members would be inappropriate where, as here, a statute is facially overbroad, as the State would be unable to enforce SB13 lawfully against any party.

## STANDARD OF REVIEW

Defendants appeal from a permanent injunction issued in conjunction with a grant of partial summary judgment. Because Defendants challenge only the legal

conclusions underlying the injunction, this Court's review is *de novo*. *See Med-Cert Home Care, L.L.C. v. Becerra*, 19 F.4th 828, 830 (5th Cir. 2021). The Court "may affirm summary judgment on any legal ground raised below, even if it was not the basis for the district court's decision." *Id.*

## ARGUMENT

### I. SB13 Violates the First Amendment.

On its face, SB13 is an overbroad and viewpoint-discriminatory law that penalizes companies for perceived anti-fossil fuel speech and membership in climate-focused associations. The record reflects Defendants have understood SB13, consistent with its plain text, to authorize the blacklisting of companies that engage in "anti-oil and gas rhetoric." ROA.516. Because SB13 penalizes substantial amounts of core expressive speech, the district court correctly held that SB13 violates the First Amendment. ROA.729.

Defendants attempt to salvage the statute by arguing that it can be read to encompass only "economic decisions" and "commercial activities," and that it does not regulate protected expression at all. Defs. Br. 18, 25. This strained interpretation is unsupported by the statute's text and contradicts their statements and implementation of the statute outside of litigation. This Court should reject it.

#### A. SB13 is Overbroad and Viewpoint-Discriminatory.

The district court correctly held that SB13 violates the First Amendment because it is overbroad. It is also viewpoint-discriminatory, imposing penalties only

for *anti*-fossil fuel expression. And, as Defendants' prelitigation interpretation and implementation of the law underscore, "a substantial number of [SB13's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Serafine v. Branaman*, 810 F.3d 354, 364 (5th Cir. 2016) (quoting *Stevens*, 559 U.S. at 473).

*1. SB13 is facially overbroad.*

Through SB13's sweeping definition of "boycott," it facially punishes a wide array of protected expression and association. The first step in an overbreadth challenge is to determine "what the statute covers." *Id.* at 365; *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) ("The first step in the proper facial analysis is to assess the state laws' scope."). In relevant part, SB13 penalizes companies that "boycott energy companies." *See* Tex. Gov't Code §§ 809.001 *et seq.*, 2276.001 *et seq.* The law defines "boycott energy companies" to mean: "without an ordinary business purpose, refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with a company because the company" is in the fossil fuel industry or does business with such a company. *Id.* § 809.001(1).

"When construing statutes and regulations, [courts] begin with the assumption that the words were meant to express their ordinary meaning." *Bouchikhi v. Holder*, 676 F.3d 173, 177 (5th Cir. 2012). The ordinary meaning of the clause *taking any*

*action that is intended to penalize, inflict economic harm on, or limit commercial relations with a company* encompasses speech or other expressive conduct intended to penalize fossil fuel companies. The plain meaning of *action* encompasses *expression*. *See Action*, Merriam-Webster, https://tinyurl.com/5b6cayvh (captured June 17, 2026) (defining *action* firstly as "a thing done: deed"); *Expression*, Merriam-Webster, https://tinyurl.com/588vx58p (captured July 1, 2026) (defining *expression* firstly as "an act, process, or instance of representing in a medium . . . ."). SB13's prohibition against "taking any action . . ." therefore incorporates expressive activity.

The modifier *any* before *action* reinforces that expressive actions are not to be excluded from the term's ordinary meaning. *See Any*, Merriam-Webster, https://tinyurl.com/53e8bwzh (captured July 1, 2026) (defining *any* firstly as "one or some indiscriminately of whatever kind"); *see also Hill v. City of Houston, Tex.*, 764 F.2d 1156, 1163 (5th Cir. 1985), *on reh'g*, 789 F.2d 1103 (5th Cir. 1986), *aff'd*, 482 U.S. 451 (1987) (ordinance making it "unlawful for any person *in any manner* to oppose, molest, abuse, or interrupt any policeman in the execution of his duty" was overbroad because it permitted many "applications that significantly compromise traditional First Amendment activities.") (cleaned up) (emphasis in original).

The "ordinary business purpose" exclusion reinforces the plain meaning of *any action* as encompassing expressive actions. Commercial activities taken

pursuant to an ordinary business purpose—such as refraining from investing in fossil fuels to maximize investment return, *see* ROA.370-71, or offering fossil-free ETFs to satisfy a market demand, *see* ROA.377—do not constitute "boycotting" as SB13 defines it. The exclusion of actions taken pursuant to ordinary business purposes indicates that SB13 targets actions taken for non-business purposes, such as advocating against reliance on fossil fuels. As the district court observed, "[i]t is admittedly difficult to imagine what sort of conduct is both not an 'ordinary business purpose' and not an expression protected by the First Amendment." ROA.733

According to its ordinary meaning, then, as the district court concluded, "the phrase 'taking any action that is intended to penalize' fossil fuels includes, for example, speaking about the risks posed by fossil fuels, advocating against reliance on fossil fuels, and associating with like-minded organizations." ROA.730. The district court correctly recognized that "these 'form[s] of speech or conduct' are constitutionally protected." *Id.* (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982)). Noting that the "boycott" definition "permits the State to penalize companies for all manner of protected expression concerning fossil fuels," ROA.729, the district court correctly held that "SB13's application to protected speech is 'substantial,' both in absolute terms and 'in relation to the statute's plainly legitimate sweep.'" ROA.731 (quoting *Stevens*, 559 U.S. at 473).

### 2. *SB13 unconstitutionally discriminates based on viewpoint.*

SB13 also unconstitutionally discriminates based on viewpoint. A state cannot "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed*, 576 U.S. at 163 (quotation omitted). The First Amendment as a corollary prohibits "the denial of public benefits to punish individuals for their speech." *Kinney v. Weaver*, 367 F.3d 337, 357 (5th Cir. 2004) (cleaned up). "When the government targets not subject matter, but particular views . . . on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829 (citation omitted). "Viewpoint discrimination is thus an egregious form of content discrimination" and "is presumed to be unconstitutional." *Id.* at 828-29.

SB13 facially discriminates based on viewpoint because it penalizes companies for making negative statements concerning fossil fuels, but not positive ones. *See Iancu v. Brunetti*, 588 U.S. 388, 394 (2019) (law that permitted "registration of [trade]marks that champion society's sense of rectitude and morality, but not marks that denigrate those concepts," was unconstitutionally viewpoint-based). Companies that, for example, engage in "anti-oil and gas rhetoric," ROA.516, are blacklisted and prohibited from contracting with the State, whereas companies that engage in pro-oil and gas rhetoric are not.

Viewpoint-discriminatory laws are constitutional only where "the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Defendants do not meet this exacting standard. Defendants contend that

SB13 furthers the State's economic interest in investing in fossil fuel companies. Defs. Br. 20. But this purported interest is counteracted by Defendants' statements that the law is meant to discourage anti-fossil fuel rhetoric, not investment behavior, *see* ROA. 354 (Crampton Article), and Defendants' actions to blacklist companies like BlackRock that were heavily invested in Texas energy companies.

Similarly, SB13 penalizes companies for joining coalitions promoting transition to renewable energy, thereby infringing on the First Amendment right to associate. See *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958). The phrase in the "boycott" definition, "refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize" fossil fuels encompasses associating with others who share the view that fossil fuels should be phased out over the coming decades.

To the extent an interest in investing in fossil fuel companies is compelling, SB13 is not narrowly tailored to this interest. The law does nothing to encourage state entities to invest in fossil fuel companies, within or outside of Texas. Nor does it encourage state entities to invest in Texas's booming renewable energy industry. Rather, SB13 prohibits state entities from investing in or contracting with companies that have taken actions to "penalize" companies in the fossil fuel industry where those actions have not been taken pursuant to an ordinary business purpose. Indeed, Defendants have used SB13 to prohibit state entities from investing in or contracting with companies that do invest in fossil fuels—including fossil fuel companies in

Texas—if company representatives have made statements they consider "advers[e]" to the fossil fuel industry. ROA.617. By the State's logic, a municipality could pass an ordinance that denies contracting opportunities to companies that support the pro-life movement or oppose restrictions on gun ownership, even though this speech, too, is constitutionally protected.

Two other federal district judges concluded that a functionally identical definition of "boycott" in Texas's "boycott Israel" law violated the First Amendment. *See Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717 (W.D. Tex. 2019); *A & R Eng'g & Testing, Inc. v. City of Hou.*, 582 F. Supp. 3d 415 (S.D. Tex. 2022). Although these decisions were vacated or reversed on appeal due to mootness or sovereign immunity, this Court did not call the merits of either decision into question. *See A & R Eng'g & Testing, Inc. v. Scott*, 72 F.4th 685 (5th Cir. 2023); *Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020).

Defendants contend that SB13's "fiduciary overrides" render it non-discriminatory. Defs. Br. 20. That SB13 permits fiduciaries to refrain from divesting from a blacklisted company or fund in limited circumstances, *see* Tex. Gov't Code §§ 809.005, 809.056, does not negate the statute's primary function of penalizing companies for their protected speech. The statute also imposes a heavy burden on a state entity to show with "clear and convincing evidence" that divesting from a

blacklisted company will result in a loss or harm to the portfolio. *Id.* § 809.056(c).[4]

*3. The record confirms Defendants exploited SB13 to penalize companies they perceive to espouse an anti-fossil fuel viewpoint.*

In SB13's case, "[t]he facial viewpoint bias in the law [has] result[ed] in viewpoint-discriminatory application." *Iancu*, 588 U.S. at 395. The district court's analysis benefited from ample record evidence that Defendants used SB13 to penalize companies for protected expression. Outside of this litigation, Defendants have repeatedly explained that they blacklist companies *because of* anti-fossil fuel rhetoric and *despite* a company's robust investment in fossil fuels.

The Comptroller announced in 2022 that SB13 punishes companies that "engage in anti-oil and gas rhetoric." ROA.516. When asked whether SB13 is intended to convince companies to "change their investment portfolios," the Comptroller replied that it is not, explaining that "some companies that . . . [are] investing in oil and gas" were nonetheless blacklisted because "their publications . . . make it seem as though they are [boycotting fossil fuels]." ROA.354; Crampton Article. These statements confirm that it is companies' speech concerning fossil

---

[4] SB13's procurement restrictions are even more inflexible. The certification requirement can be waived when necessary to comply with constitutional or statutory duties related to debt obligations and state banking contracts. *See* Tex. Gov't Code § 2276.002(c). But SB13 provides no exception whatsoever for contracts for the wide range of other goods and services that state and local governments purchase.

fuels—and not their investment behavior—that is the key determinant for whether the State considers them to "boycott" fossil fuels under SB13.

The Comptroller implemented SB13 accordingly, blacklisting companies on account of their expression, and not their "commercial conduct." In responding to the Comptroller's questionnaire, BlackRock explained that it does not "boycott" fossil fuels under SB13 because it held $115 billion in Texas energy companies and, in any case, the "ordinary business purpose" exclusion in the definition of "boycott" applied to any decision not to invest in any particular company. ROA.391, 398-400; *see also* ROA.404-05, 419-21. Yet the Comptroller blacklisted BlackRock, ROA.482, 491, 500, 509, asserting that the company's "'net-zero' public pledges" and "adversarial rhetoric regarding the fossil fuels sector" were "actions that satisfy the boycotting criteria." ROA.617.

Several other companies including Credit Suisse, State Street Global Advisors, and BNY Mellon similarly stated in their questionnaire responses that they consider climate risk relevant to overall financial risk and performance but explained they do not "boycott" fossil fuels under SB13. *See* ROA.430-32, 435, 438, 440, 445-49. Yet Credit Suisse, several State Street funds, and BNY Mellon were blacklisted. *See* ROA.482, 483-84, 487, 491, 492-93, 496, 500, 502, 505, 509, 510-11, 513. Nor were ASBC's blacklisted members, Etho Capital and Sphere, removed from the blacklist even after setting forth, under oath in this litigation, their ordinary business purposes for designing their flagship funds to screen out fossil fuel investments.

ROA.370-71, 373-74, 377-78, 380-81. The record evidence thus underscores the statute's constitutional infirmities.

The record also reflects that Defendants have applied SB13 to penalize companies for their associations. In implementing SB13, the Comptroller considered whether companies are members of associations that advocate for sustainable investing (and other sustainability measures) in determining whether to blacklist the companies. *See, e.g.*, ROA.394-95 (describing BlackRock's membership in certain associations in response to Comptroller's questionnaire). The Comptroller also publicly stated in 2022 that companies seeking to be removed from the blacklist "would no longer meet the initial criteria for listing" if they discontinued their membership in such associations. ROA.542. The Attorney General likewise stated in 2023 that state entities must take "particular notice" of "whether [a] company is a member of the Net Zero Alliance or a signatory of any other similar entity" in determining whether SB13 permits the state entity to contract with the company. ROA.625.

### B. Defendants' Efforts to Undermine the District Court's Reasoning Fail.

Defendants attempt to salvage SB13 by rewriting it and disavowing the way it has been understood and applied. They also wrongly fault the district court for not considering arguments they failed to make, which are, in any event, meritless.

*1. The district court correctly applied the test for overbreadth.*

Defendants contend, for the first time, that the district court did not apply the proper test for First Amendment overbreadth. Defs. Br. 27-28 (citing *Moody*). Although *Moody* was issued on July 1, 2024—well before the parties' summary judgment briefing—Defendants did not cite it in describing the standard for evaluating overbreadth in their papers, nor did they argue that the standard advanced by ASBC was inaccurate. *See* ROA.276-77, 333-34, 672-73. Defendants' argument on appeal that the district court erred in applying pre-*Moody* overbreadth doctrine is therefore forfeited. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal . . . .").

In any case, the district court properly evaluated SB13 for overbreadth. *Moody* "espoused existing law," *Woodlands Pride v. Paxton*, 168 F.4th 293, 308 n.13 (5th Cir. 2026); it did not change the standard for First Amendment overbreadth claims, *see Moody*, 603 U.S. at 723-24. *Moody* maintained the rule that a court must determine whether "a substantial number of [a statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Serafine*, 810 F.3d at 364 (quoting *Stevens*, 559 U.S. at 473); *see also Moody*, 603 U.S. at 723 (In First Amendment overbreadth cases, "[t]he question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." (cleaned up)). Crucially, "even a law with

a 'plainly legitimate sweep' may be struck down in its entirety" if its "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 723-24.

The district court completed that analysis. The court first determined that SB13's "boycott" definition is not limited to "commercial conduct," as Defendants argued. ROA.729. The court then concluded that the definition's inclusion of expression was unconstitutional and that, indeed, the unconstitutional applications were many: SB13 "permits the State to penalize companies for all manner of protected expression concerning fossil fuels." *Id.* The court observed that SB13 "affects a broad range of protected activities" and listed as examples of unconstitutional applications penalizing companies for "speaking about the risks posed by fossil fuels, advocating against reliance on fossil fuels, and associating with like-minded organizations," noting that ASBC's members engage in these forms of expression. ROA.730 (quotation omitted). In discussing the statute's vagueness, the district court also noted that the "boycott" definition's "ordinary business purpose" exclusion made it "difficult to imagine" which non-expressive conduct—i.e., what commercial activities—could fall within the definition. ROA.733. The district court therefore concluded that, in both absolute and relative terms, SB13's unconstitutional applications outweigh constitutional ones. ROA.731.

The extensive record of Defendants' interpretation and application of SB13 also obviates any concern that holding SB13 facially unconstitutional would require

"speculation about the law's coverage and its future enforcement," *Moody*, 603 U.S. at 723 (internal quotation omitted), the animating concern behind the overbreadth standard. Defendants assert that ASBC's "decision to bring a facial challenge 'comes at a cost.'" Defs. Br. 27 (quoting *Moody*, 603 U.S. at 723). But this "cost" is only implicated where "the State has had no opportunity to implement" the law. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). This is not a pre-enforcement challenge and no "speculation" is necessitated by a "factually barebones record[]" regarding the State's implementation of SB13. *Id. Cf. Woodlands Pride*, 168 F.4th at 308 (remarking that parties did not "adequately develop the record" to conduct overbreadth analysis). To the contrary, the ample record, which is based on public documents reflecting years of implementation showing how SB13 has operated in practice, demonstrates that the unconstitutional applications of SB13 are both "realistic" and "substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023). Nor need the Court speculate about Defendants' motivations where the record makes them explicit; Defendants candidly admitted to blacklisting companies that engage in "adversarial rhetoric regarding the fossil fuels sector." ROA.617.

*2. No canon or principle of statutory construction overrides the ordinary meaning of SB13.*

Defendants make little effort to defend the proposition that they can constitutionally penalize companies based only on their expressive speech. Instead, they primarily argue that the statute is best read to apply only to commercial conduct

and not to expressive speech, such as criticism of the fossil fuel industry, that is independent of investment decisions or procurement contracts. But this construction is belied by both the plain text of the statute and years of contrary application by the Comptroller. Defendants nonetheless contend that the *ejusdem generis* and *noscitur a sociis* canons of statutory interpretation and the constitutional avoidance principle limit the meaning of *action* in SB13's "boycott" definition to only "commercial activities." Defs. Br. 24-27. They do not.

a. *First*, *ejusdem generis* "may not be used to defeat the obvious purpose" of SB13. *United States v. Alpers*, 338 U.S. 680, 682-83 (1950). It is fundamental that "[w]hen construing statutes and regulations, [courts] begin with the assumption that the words were meant to express their ordinary meaning." *Bouchikhi*, 676 F.3d at 177. As discussed above, the plain meaning of the word *action* in the "taking any action" clause, Tex. Gov't Code § 809.001(1), encompasses expressive actions. The Supreme Court has cautioned courts not to apply *ejusdem generis* "woodenly," *Ali*, 552 U.S. at 227, and the Supreme Court of Texas entreated courts to "recognize that there are simply times when the canon does not apply . . . ." *City of San Antonio v. Realme*, 731 S.W.3d 342, 351 (Tex. 2026) (internal quotation omitted). Here, the "obvious purpose" of SB13—to penalize companies that advocate against reliance on fossil fuels—is manifested in both the ordinary meaning of the text and Defendants' own statements and actions interpreting and implementing it. Applying the *ejusdem generis* canon to SB13's "boycott" definition would "hamper[] rather

than help[] the search for genuine textual meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 211-12 (2012) ("Scalia & Garner").

*Second*, the semantic structure of SB13's "boycott" definition precludes application of *ejusdem generis*. The canon applies to the "semantic structure in which an enumeration of specific terms imparts a restrictive meaning to a generic follow-on phrase." *Buluc*, 930 F.3d at 389. The "taking any action" clause is not a "generic follow-on phrase," *id.* at 389 (internal quotation omitted), typical of statutes to which the canon applies. *See* Scalia & Garner 200-01 (collecting examples). Rather, it is a lengthy description of the kinds of actions the "boycott" definition encompasses. The clause contemplates expressive actions so long as they are "intended to penalize, inflict economic harm on, or limit commercial relations with" fossil fuel companies or those that do business with them.

*Third*, *ejusdem generis* does not apply to disjunctive phrases. *See Ali*, 552 U.S. at 225. The "taking any action" clause in SB13's "boycott" definition is disjunctive: it is one of three verb phrases, each of which independently satisfies the "boycott" definition. The verb phrases' "grouping as distinct categories signals contextually that they have independent meaning." *Buluc*, 930 F.3d at 390 (rejecting argument that *connives* and *conspires* should limit the meaning of *action* to one that is jointly undertaken).

*Fourth*, even were the court to apply the *ejusdem generis* canon to SB13's "boycott" definition, that application would not yield the narrow interpretation advanced by Defendants. The Court's task is to "[c]onsider the listed elements, as well as the broad term at the end, and ask what category would come into the reasonable person's mind." Scalia & Garner 208. Considering *refusing to deal with* and *terminating business activities with* as the listed terms, and the "taking any action" clause as the follow-on generic term, the category that would come into the reasonable person's mind is actions intended to harm fossil fuel companies (for non-business purposes), or something similar. That category would not be, as Defendants assert, non-expressive "commercial actions."

In ordinary parlance, expressing displeasure with an industry with the intent to penalize or inflict economic harm on it *is* of a kind with refusing to deal and terminating business activities with it. And the category of actions intended to "penalize" or "inflict economic harm on" is plainly broader than the category of "commercial actions" that Defendants propose. Indeed, that an action must be "intended to" penalize fossil fuel companies reinforces that the "taking any action" clause encompasses protected expression. *See Amawi*, 373 F. Supp. 3d at 756 (rejecting the State's identical *ejusdem generis* argument concerning the analogous "boycott Israel" law in part because the "purposive language immediately following" the phrase "any action" indicates the clause targets conduct "*because of its message*").

Defendants' proposed category of "commercial actions" only exists if one is actively trying to force-fit the verb phrases in SB13's "boycott" definition into categories of speech or expression recognized under the various First Amendment doctrines. But nothing in the statute's text suggests a court should transpose First Amendment doctrinal categories onto the definition, and a "reasonable person" certainly would not read the statute through that lens.

b. For similar reasons, Defendants' *noscitur a sociis* argument, Defs. Br. 26, also fails. As explained above, ascribing the ordinary meaning to the term *action* in the "taking any action" clause would not be "inconsistent" with the accompanying clauses, so the *noscitur a sociis* canon is inapplicable. *See Yates v. United States*, 574 U.S. 528, 543 (2015). Any emphasis in the statute on actions taken in a commercial context is "not inconsistent with the conclusion that" SB13 "sweeps as broadly as its language suggests." *Ali*, 552 U.S. at 226. The district court correctly agreed with the Southern District of Texas, which rejected the State's *noscitur a sociis* argument concerning the "boycott Israel" law, observing that "it is difficult, if not impossible, to see how 'any action' is limited to conduct outside the purview of the First Amendment.'" ROA.730 (quoting *A & R Eng'g & Testing, Inc.*, 582 F. Supp. 3d at 431-32).

c. Finally, Defendants argue that the constitutional avoidance principle supports their interpretation of SB13. Defs. Br. 25. But a court "must not and will not [construe legislation] to the point of perverting the purpose of a statute or

judicially rewriting it." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 662 (2012) (Scalia, J., dissenting) ("But we cannot rewrite the statute to be what it is not."). "Courts should 'impose a limiting construction on a statute only if it is readily susceptible to such a construction.'" *Serafine*, 810 F.3d at 369 (quoting *Stevens*, 559 U.S. at 481). As described above, SB13 is not. Indeed, after a federal court had already held that a substantively identical statute violated the First Amendment, *see Amawi*, 373 F. Supp. 3d at 756, the legislature nonetheless chose to adopt the same formulation here without refining the scope of the constitutionally problematic "boycotting" definition. This Court should "decline to give it an additional extra-textual limiting construction in a frantic attempt to rescue it." *Id.*

*3. Defendants' cases are inapposite.*

Because Defendants' position is grounded in an indefensible reading of SB13, their reliance on cases involving statutes that regulate conduct rather than expression is misplaced. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.* ("*FAIR*") involved the Solomon Amendment, which conditioned certain federal funds on graduate schools permitting military recruiters access equal to that of non-military recruiters. 547 U.S. 47, 51 (2006). Unlike SB13, the Solomon Amendment "neither limit[ed] what law schools may say nor require[d] them to say anything." *Id.* at 60. The Court held that universities subject to the Solomon Amendment would "remain free under the statute to express whatever views they may have." *Id.* Here,

Defendants have been explicit that companies must refrain from "engag[ing] in anti-oil and gas rhetoric," ROA.516, if they want to avoid being blacklisted or remain eligible for state contracts.

The "boycott" statute at issue in *Arkansas Times LP v. Waldrip as Trustee of University of Arkansas Board of Trustees*, 37 F.4th 1386 (8th Cir. 2022), likewise differed substantively from SB13 in crucial ways. Arkansas's law defines "boycott" as "engaging in refusals to deal, terminating business activities, or other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner." Ark. Code Ann. § 25-1-502(1)(A)(i). The Eighth Circuit construed that statute as regulating only non-expressive conduct, but for several reasons, a similar limiting construction is unavailable here.

*First*, the Arkansas law does not exclude from the definition of "boycott" actions taken pursuant to an "ordinary business purpose." *Compare id.*, *with* Tex. Gov't Code § 809.001(1). Because SB13 expressly *excludes* much commercial conduct from its "boycott" definition, it cannot regulate *only* commercial conduct.

*Second*, the semantic structure of the Arkansas law is different from that of SB13. Rather than disjunctive verb phrases, *see supra* page 30, the Arkansas law includes two verb phrases followed by the generic term *or other actions*. Accordingly, the Eighth Circuit applied *ejusdem generis* to construe *other actions* to

"relate solely to commercial activities." *Ark. Times*, 37 F.4th at 1393. For the reasons discussed above, it would be inappropriate to apply *ejusdem generis* to SB13.

*Third*, unlike SB13, the Arkansas law's "boycott" definition does not include actions intended *to penalize* the fossil fuel industry. *Penalize* plainly encompasses inflicting harm beyond economic harm. *See Penalize*, Merriam-Webster, https://tinyurl.com/3dtx4m5n (captured July 1, 2026) ("to inflict a penalty on"); *Penalty*, Merriam-Webster, https://tinyurl.com/wx2hvrnb (captured July 1, 2026) ("disadvantage, loss, or hardship due to some action").

*Fourth*, SB13 includes the word *any* before *action*, signifying that an action "indiscriminately of whatever kind"—which includes expressive actions—can satisfy the "boycott" definition. *See Any*, Merriam-Webster, https://tinyurl.com/53e8bwzh (captured July 1, 2026). The Arkansas law does not. The Eighth Circuit's reasoning in *Arkansas Times*—which relied on a narrow reading of *other actions* in light of the preceding phrases *refusing to deal* and *terminating business activities*—is thus inapplicable to SB13, whose much broader "taking any action" clause encompasses expression.

*Fifth*, there was no record in *Arkansas Times* that the state interpreted and implemented the "boycott" law to penalize companies based on anti-Israel expression. By contrast, the record here demonstrates that over the several years that SB13 has already been in force, Defendants interpreted and implemented it to penalize companies based on expression critical of the fossil fuel industry.

### 4. *Defendants' market participant theory is wrong.*

Defendants also argue that even if SB13 implicates protected expression, it is nonetheless constitutional because Texas is acting as a market participant rather than as a regulator. But "[t]he First Amendment shields speech not only from direct limitations but also from adverse government action against individuals because of their speech, including the denial of public benefits to punish individuals for their speech." *Kinney*, 367 F.3d at 357 (cleaned up); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (recognizing that, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes his . . . freedom of speech"); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (reaffirming that "a funding condition can result in an unconstitutional burden on First Amendment rights"). Thus, as Defendants' own case makes clear, the First Amendment is violated when the government is unable to show it "canceled [a] contract for any reason besides disagreeing with [the contractor's] viewpoint." *Oakes Farms Food & Distrib. Servs., LLC v. Adkins*, 154 F.4th 1338, 1346 (11th Cir. 2025).

Defendants argue that the "State of Texas wishes to invest in fossil fuel companies" and that it may do so under its proprietary right to direct state investment funds. Defs. Br. 20. But this framing evades the crucial question. While Texas can invest in fossil fuels or anything else it wishes—at least to the extent consistent with

its fiduciary duties to plan beneficiaries—SB13 does not mandate investment in Texas or any other fossil fuel companies. What SB13 requires, and what the State cannot justify, is the denial of opportunity to compete for state funds based on the content of protected speech.

Defendants similarly confuse the issues in arguing that the State is under no obligation to subsidize boycotts of fossil fuel companies. Defs. Br. 21. ASBC is not challenging the State's value judgment about where to allocate funds, but rather, is challenging the State's impermissible effort to leverage its considerable economic power as a means of chilling protected speech. Indeed, even Defendants acknowledge, as they must, that the state cannot "leverage funding to regulate speech outside the contours of the program" at issue. *Id.* (quoting *Agency for Int'l Dev.*, 570 U.S. at 214-15). Yet, that precisely describes SB13. Indeed, Defendants offer no explanation at all for how this test is satisfied in the context of a statute that requires all contracts of a certain size to include a certification against boycotting fossil fuel companies, even when the contract is completely unrelated to fossil fuels.

Defendants suggest that the Comptroller's decision to bifurcate the blacklist into two Annexes mitigates its impact because "'[t]he Comptroller may contract with companies related to funds listed in Annex 2 if they make the written verification required by'" SB13. Defs. Br. 23 (quoting ROA.585). Yet this statement is at odds with the Attorney General's aggressive enforcement policy advising state entities that "[a]ny contract with any company on the Comptroller's list . . . is likely to be

illegal under SB13," without distinguishing between Annex 1 and 2, and admonishing that "Governmental entities cannot blindly rely on written verifications." ROA.623. An Annex 2 company that signs a verification that it does not boycott fossil fuels would risk cancellation of the contract and damages should the State determine it boycotts fossil fuels during the contract term. *See, e.g.*, ROA.634-35. Moreover, SB13 gives the Comptroller authority to blacklist only publicly traded companies—not exchange traded funds. *See* Tex. Gov't Code §§ 809.051, 809.001(4). Far from a form of tailoring, in devising Annex 2, the Comptroller expanded the application of the statute beyond its explicit limits. In any case, Defendants' assertions concerning the Annexes ignore the fundamental point that SB13 does not in fact direct the State where to invest or spend public funds.

**C. The "Taking Any Action" Clause Is Not Severable.**

As a fallback, Defendants argue that at least part of SB13 is salvageable and that only the "taking any action" clause should be severed from SB13. *See* Defs. Br. 28-29. As an initial matter, severing the "taking any action" clause would only make sense if the statute's defects were limited to that provision. But they are not. In fact, severing the "taking any action" clause would leave the "boycott" definition with two phrases—"refusing to deal with" and "terminating business activities with," *see* Tex. Gov't Code § 809.001(1)—which, as the district court recognized, are themselves vague. ROA.731-32. It would be unclear, for example, how the Comptroller would determine whether a financial company that both invests

significantly in fossil fuels and maintains fossil fuel-free funds is "refusing to deal with" or "terminating business activities with" companies in the fossil fuels sector.

But severance is improper here regardless. The Texas Supreme Court has instructed not to sever provisions that are "connected in subject-matter, dependent on each other, operating together for the same purpose," or "essentially and inseparably connected in substance" with unsevered provisions. *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (quotation omitted). The court performs this inquiry regardless of Tex. Gov't Code § 312.013. *See Builder Recovery Servs. LLC v. Town of Westlake*, No. 02-20-00051-CV, 2023 WL 3878446, at *9 (Tex. App. June 8, 2023).

SB13's statutory scheme is built around the core definition of "boycott energy companies." The "taking any action" clause is a key component of the "boycott" definition and is essential not only to SB13's operation, but also to Defendants' interpretation and implementation of the statute to date. Severing such a key provision is unsupported by Texas law and would be inappropriate.

## II. SB13 Is Also Unconstitutionally Vague.

The district court also rested its decision on an independent holding that SB13 is unconstitutionally vague. ROA.731-33. Defendants fail to demonstrate any error in this holding.

### A. SB13 Lacks Discernable Standards, Which Has Predictably Resulted in Arbitrary Enforcement.

1. The district court correctly recognized that SB13's definition of prohibited boycotting activity both "fails to provide a reasonable opportunity to know what conduct is prohibited" and "invites—and has in fact already led to—discriminatory enforcement." ROA.731.

SB13's problems begin with its virtually boundless bar on "refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations" with a fossil fuel company. Tex. Gov't Code § 809.001(1). As discussed at length above, this broadly worded definition—particularly the catchall covering "any action" designed to penalize a fossil fuel company—has an expansive scope that reaches significant quantities of political advocacy and other core protected speech.

The statute's ambiguity is substantially compounded by its exception for activities taken for an "ordinary business purpose." Tex. Gov't Code § 809.001(1). As the district court recognized, this provision produces a "puzzling" result because it is "difficult to imagine what sort of conduct is both not an 'ordinary business purpose' and not an expression protected by the First Amendment." ROA.732-33. Defendants' construction of the "ordinary business purpose" exclusion as covering all scenarios in which a firm "declines to invest in a fossil fuel company for neutral risk-adjusted return, diversification, or other standard financial reasons" (Defs. Br.

36), only amplifies the district court's well-founded concern. After all, if the exclusion carves out the routine commercial applications of the statute that Defendants insist form the statute's core, it is unclear what the statute covers besides the expressive activity that Defendants insist falls outside the statute's scope.

The ambiguity inherent in the statute is borne out by a documented history of "discriminatory and arbitrary implementation of SB 13 [that] demonstrates its vagueness." ROA.733; *see also* ROA.652 (amicus brief of Harris County recounting how the county has been unable to "predict whether the Comptroller or Attorney General will declare any given dealers ineligible under SB 13"). The Comptroller has blacklisted companies despite having been provided with ordinary business explanations for the purportedly prohibited investment decisions. ROA.732-33; *see also, e.g.* ROA.396 (explaining "BlackRock does not have any policies prohibiting or restricting investment in companies because they are energy companies," that "many of our clients remain long-term investors in the energy sector," and the decision in the context of certain funds to switch away from investments tied to thermal coal was "like any other investment decision our active portfolio managers make . . . grounded in an analysis of that investment's risk/return profile"); ROA.432 (explaining that the Credit Suisse policies were "grounded in an ordinary business purpose, namely ordinary risk management"); ROA.438 ("As a fiduciary and long-term investor, [State Street Global Advisors] believes that climate risk can be relevant to a company's long term financial performance."); ROA.475 (firm's

"current focus on companies that directly and materially are exposed to thermal coal mining is consistent with our business judgment that these companies are not sustainable over the long-term as a valuable investment proposition unless they transition to a new model").

Indeed, the Comptroller has even taken the position that a company may be blacklisted when it has not "ceased investing in fossil fuels." ROA.617. Merely making a "net-zero" carbon pledge for the company's own corporate operations or "employ[ing] adversarial rhetoric regarding the fossil fuels sector" can "satisfy the boycotting criteria developed by the Comptroller's office." ROA.617; *see also* ROA.391 (stating "BlackRock currently has approximately $310 billion in assets invested in energy companies globally, including over $115 billion invested in Texas energy companies alone"), ROA.405 (noting that BlackRock was nonetheless blacklisted because of "adversarial rhetoric regarding the fossil fuels sector"). Thus, Defendants are wrong in suggesting that companies always have the option of "invest[ing] in fossil fuel companies" as a means of avoiding blacklisting. Defs. Br. 31 (quotation marks omitted).[5]

[5] While investment in fossil fuels is not sufficient to avoid a finding of prohibited boycotting, it is also not necessary. SB13 has never been understood to mandate the blacklisting of every company that happens not to invest in fossil fuels. For example, if a company operates a sector specific fund that focuses on a commodity or industry such as real estate, precious metals, or artificial intelligence, it might not hold any fossil fuel related investments. But it does not appear that Defendants have ever construed such choices as prohibited boycotting. Texas has not mandated that its funds be invested in the fossil fuel sector.

2. Defendants do not seriously deny that the definition of boycotting activity is ambiguous. Instead, they argue that this lack of clarity is constitutionally tolerable because SB13 is merely a funding provision that does not impose civil or criminal penalties. Defs. Br. 31-34. This misdescribes SB13's impacts and, in any case, would not be dispositive. Because SB13 implicates and potentially chills constitutionally protected speech, its vagueness cannot be so readily excused. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("When speech is involved" there is a particular need for "rigorous adherence" to the principle that "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010) (assuming that "a heightened [vagueness] standard applies" in cases in which the statute at issue "potentially implicates speech").

There is also far more at stake in SB13 than mere "selective subsidies," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998), or an internal governmental directive that did not "regulate private conduct." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 101 (4th Cir. 2026). Blacklisted companies are publicly branded. *See* Tex. Gov't Code § 809.051(d) (specifying that "the comptroller shall file the [black]list with the presiding officer of each house of the legislature and the attorney general and post the list on a publicly available Internet website"). And loss of eligibility for government contracting is also a significant consequence that triggers due process concerns. *See Trifax Corp.*

*v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (recognizing that "debarring a corporation from government contract bidding constitutes a deprivation of liberty that triggers the procedural guarantees of the Due Process Clause").

While SB13 does not establish a penalty scheme, it exposes companies to significant contract damages. Government contractors must sign a written verification that they do not and will not "boycott energy companies" and face consequences if the company is later blacklisted and the certification is deemed to have been false. *See* 34 Tex. Admin. Code § 20.585(a) (specifying a breach of contract terms can be grounds for contract cancellation, assessment of damages, and debarment from contracting). In 2023, the Attorney General pursued UBS for a false certification under SB13 with respect to a contract between the bank and a school district. UBS was compelled to pay an $850,000 settlement for damages resulting from the cancellation of the contract following the bank's blacklisting. ROA.634-35. As a result, SB13's lack of clarity or administrable standards cannot be dismissed.

3. Defendants also try to avoid the documented history of SB13's arbitrary and discriminatory enforcement by arguing that the Court should ignore the "Comptroller's enforcement choices and public statements" when considering a facial challenge to SB13. Defs. Br. 37. But years of history demonstrating how the statute has been enforced vividly illustrate the defects inherent in the statute's structure. Moreover, on a facial challenge, this Court is required to consider the

government's "authoritative constructions of the [challenged statute], including [the government's] own implementation and interpretation of it." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992); *see also Magee v. City of S. Padre Island,* 463 F. App'x 377, 381 (5th Cir. 2012). The district court was thus entirely correct to rely on the Comptroller's interpretation and application of SB13, including repeated instances of targeting firms not because of their investment portfolios, but rather, because of their choice of speech or associations.

**B. ASBC Has Standing to Challenge SB13's Vagueness.**

Defendants seek to escape this Court's consideration of these defects, arguing that ASBC lacks associational standing to challenge SB13's vagueness. However, this argument only underscores both SB13's incoherence and SB13's impermissible targeting of constitutionally protected speech.

Defendants' argument hinges on their assertion that SB13 is not vague as applied to Etho Capital and Sphere. Defs. Br. 29-31. But the district court correctly rejected Defendants' contention that "Plaintiffs' conduct 'falls squarely within the [statute]." ROA.733 (alteration in original). After all, while Defendants emphasize that Etho Capital and Sphere funds are "refusing to deal with" fossil fuels companies, that does not answer the question of whether the funds' investment decisions fall within the exclusion for "ordinary business" activity. Tex. Gov't Code § 809.001(1).

Defendants offer no coherent explanation for why Etho and Sphere are not engaged in ordinary business activity. Etho Capital invests in companies that manage

their long-term environmental risks in a belief that this "investment methodology identifies better run, more efficient companies that often outperform their competitors" as supported by Etho Capital's research demonstrating that "when a company's climate efficiency rises, the overall risk-return profile and financial performance of the company improves." ROA.371. Responding to "consumer demand," Etho Capital created a fund that "avoid[s] the financial and market risks posed by massive changes in the oil and gas industry." ROA.371, 373. Sphere similarly designed its fund to "satisfy market demand for a sustainable retirement plan investment option and to practice sound investment strategy" that reflects that "[i]nvesting in fossil fuels carries financial and market risks." ROA.377.

Thus, under Defendants' own description of "ordinary business purpose" activity as covering decisions that are grounded in "neutral risk-adjusted return" and "other standard financial" justification (Defs. Br. 36), it is difficult to fathom why Etho Capital and Sphere do not satisfy that exception. After all, avoiding investments based on the belief that they present excessive long-term risk is certainly a judgment made with an eye toward "risk-adjusted return." Responding to consumer demand is also a "standard financial" consideration.

Defendants counter by emphasizing that Etho Capital and Sphere "advocate against reliance on fossil fuels" and "mak[e] public statements expressing . . . views on fossil fuels, climate change, and climate risk." Defs. Br. 36-37 (quoting ROA.373, 380). But this argument is irreconcilable with Defendants' insistence that SB13

applies only to non-expressive economic purchasing decisions as opposed to associated expressive activities. *Id.* 18-19. In arguing that Etho Capital and Sphere fall within the heartland of SB13 because of their constitutionally protected expression, rather than their bare choice of investments, Defendants fatally undermine their own First Amendment defenses.

Moreover, having SB13's applicability turn on the content of a company's speech increases, rather than diminishes, the statute's vagueness. As noted, vagueness concerns are amplified when a statute threatens to chill protected speech. *See Fox Television Stations,* 567 U.S. at 253. And SB13 provides no objective criteria for determining when a company's statements regarding the fossil fuel industry are sufficiently skeptical to trigger blacklisting.

At bottom, SB13 provides no meaningful standards applicable to Etho Capital and Sphere, or anyone else. All companies are subject to the caprice of the Comptroller. The district court was correct to conclude that this renders the statute impermissibly vague.

## III. ASBC Has Standing to Challenge the Procurement Provision.

Defendants try to evade review of SB13's Procurement Provision, but ASBC has associational standing to maintain that challenge. As an initial matter, Defendants contend only that ASBC has not demonstrated it has suffered an injury on account of the Procurement Provision; they do not contest any other aspect of

ASBC's standing to bring its constitutional claims against SB13. *See* Defs. Br. 14-17.

ASBC has established an injury sufficient to confer standing to bring a First Amendment challenge to the Procurement Provision. When evaluating facial challenges to restrictions of expression, the Court may "relax the prudential limitations and allow yet-unharmed litigants to attack potentially overbroad statutes—'to prevent the statute from chilling the First Amendment rights of other parties not before the court.'" *Fairchild*, 597 F.3d at 754 (quoting *Joseph H. Munson Co*., 467 U.S. at 956-58). ASBC has established that two of its members have been harmed by being blacklisted as energy "boycotters" under that definition. *See* ROA.374-75, 380-81. The Procurement Provision relies on the same "boycotting" definition as the Divestment Provision. Defendants have moreover tethered the two provisions in implementing SB13, stating that "[a]ny contract with any company on the Comptroller's list [the blacklist] . . . is likely to be illegal under SB 13 . . . ." ROA.623. The district court therefore correctly determined that ASBC's challenge to SB13 should not be limited to the Divestment Provision. ROA.727-29.

## IV. Defendants Fail to Show Entitlement to a Narrower Injunction.

Finally, Defendants briefly attack the scope of the district court's injunction, arguing that it should not cover anyone other than ASBC's members. But Defendants did not press this argument in the district court and have now forfeited it. *See Rollins*, 8 F.4th at 397-98 (this Court generally will not consider issues not raised in district

court); *see also New Jersey v. Trump*, 131 F.4th 27, 42-43 (1st Cir. 2025) (refusing to consider argument for narrowing a nationwide injunction in context of motion for a stay pending appeal where "the Government did not apprise the District Court of the alternative injunction that it now identifies in its [court of appeals] stay motion"); *Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) (finding that California "did not preserve its challenge to the statewide scope of [an] injunction" when it did not adequately present the issue in district court).

Defendants ask this Court to excuse their forfeiture on the ground that summary judgment briefing was completed before the Supreme Court decided *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). But Defendants could have preserved the issue while *CASA* was pending, could have filed a notice of supplemental authority in further support of their opposition to the then-still pending summary judgment motion after *CASA* was decided, or could have sought reconsideration based on *CASA* after the district court ruled. Defendants did none of these and instead ask this Court to decide the question in the first instance.

This failure to present the question to the district court is particularly inexcusable because *CASA*'s applicability to cases involving First Amendment overbreadth claims is, at minimum, uncertain. *See Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (Kavanaugh, J., concurring) (explaining that a case involving "a First Amendment overbreadth challenge, which presents its own doctrinal complexities about the scope of relief" would be "an imperfect vehicle for

considering the general question of whether a district court may enjoin a government from enforcing a law against non-parties to the litigation"). Indeed, citing the Supreme Court's repeated statements that unconstitutionally overbroad laws may be enjoined in their entirety, at least one district court has concluded that "*CASA* . . . does not address the need for broader injunctions in the First Amendment context." *Welty v. Dunaway*, 791 F. Supp. 3d 818, 843 (M.D. Tenn. 2025).

The analysis is further complicated by the fact that the entire state of Texas falls within the Fifth Circuit, so if this Court affirms the judgment below on the merits, there will be controlling precedent across the entire state establishing that the challenged statute is unlawful. The U.S. Solicitor General acknowledged before the Supreme Court in *CASA* that if the Supreme "Court were to hold a challenged statute or policy unconstitutional, the government could not successfully enforce it against anyone, party or not, in light of stare decisis." Transcript of Oral Argument at 55, *Trump v. CASA*, No. 24A884 (U.S. 2025). In the context of a Texas statute, a ruling from this Court would have similar preclusive scope.

Given these complexities, this Court should not decide the scope of relief question in the first instance without the benefit of either a district court decision or adversarial presentation beyond Defendants' cursory citation to *CASA*.

## CONCLUSION

The Court should affirm the judgment of the district court.

July 2, 2026

Respectfully submitted,

*/s/ Rachel Lauren Fried Nguemaha*
Rachel Lauren Fried Nguemaha
Joshua M. Salzman
Victoria S. Nugent
Brian D. Netter
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 340-5828
rnguemaha@democracyforward.org

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,808 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365, set in Times New Roman font in a size measuring 14 points.

*/s/ Rachel Lauren Fried Nguemaha*
Rachel Lauren Fried Nguemaha